UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ERIC ADAMS 2025, ERIC ADAMS, SHARON ADAMS, as Treasurer of Eric Adams 2025, MARIETTA ROZENTAL, and MALCOLM ADAMS,<br><br>                                      Plaintiffs,<br><br>– against –<br><br>NEW YORK CITY CAMPAIGN FINANCE BOARD,<br><br>                                      Defendant. | Docket No. |

**COMPLAINT**

**Preliminary Statement**

Plaintiffs Eric Adams 2025, Eric Adams, Sharon Adams (as treasurer of Eric Adams 2025), Marietta Rozental, and Malcolm Adams (collectively, the "Adams Campaign"), by their attorneys Abrams Fensterman LLP, as for their complaint alleges as follows:

1. Since November 2024, defendant New York City Campaign Finance Board (the "CFB") has repeatedly tried to skew New York City's mayoral election by arbitrarily, capriciously, and unconstitutionally denying public campaign matching funds to the incumbent candidate, Mayor Eric Adams. It has shown a deplorable and anti-democratic bias against the Adams Campaign and has done all it can to deprive the Adams Campaign of public funds intended to amplify political speech and civic debate for all candidates, including those the CFB does not favor, and for the benefit of all New Yorkers.

2. Time and again, the CFB has rejected the campaign's application for public matching funds, falsely maintaining, without any evidence, that Mayor Adams had engaged in misconduct

that disqualifies him from the program. From November 2024 and continuing through April 2025, the CFB denied the Adams Campaign approximately $3.5 million in matching funds based solely on a federal indictment that was dismissed with prejudice – the CFB nevertheless claiming it had "reason to believe" that Mayor Adams had violated the agency's rules. This Court squarely rejected that rationale as unconstitutional in *Adams v. New York City Campaign Finance Board*, 2025 WL 1920885, 25-CV-3380 (NGG) (LKE) ("Adams I"), underscoring that an indictment is not *proof* of any wrongdoing. By using a dismissed indictment to deny the Adams Campaign public matching funds, the Court reasoned, the CFB plausibly violated important free speech and due process protections. The Court nevertheless upheld the CFB's denial of funds, however, on the grounds that the Adams Campaign filed a late response to an agency request for information.[1] A copy of the decision is attached as Exhibit A.

3. The CFB's egregious misconduct – in violation of our nation's most basic civil liberties – was ultimately absolved on a technicality. But this Court sent a stern warning to the agency. Individuals are presumed innocent, and they may not be denied campaign matching funds based solely on unproven allegations and biased intentions.

4. The CFB arrogantly ignored that warning and remarkably did it again. On August 6, 2025, the agency once again denied the Adams Campaign $4.7 million in matching funds, this time claiming that: (i) the campaign had failed timely to provide information that verifies campaign activity; and (ii) the CFB had reason to believe that the Adams Campaign engaged in conduct that was detrimental to the matching funds program by violating the law. It is déjà vu all over again.

5. The CFB's rejection of the campaign's most recent application is as pre-textual as it was

---

[1] To be sure, the agency's draconian penalty was unduly harsh, especially considering that the Adams Campaign had a legitimate reason for the late submission and the CFB did not show any prejudice from the delay.

2

pre-ordained. Contrary to the CFB's fabricated findings, the Adams Campaign fully cooperated with its request for documents. It produced to the CFB all responsive (non-privileged) documents within its possession and control, holding back only those materials to which the campaign had access only as a result of the production by the United States Attorney's Office to Mayor Adams's legal team in the criminal discovery process. Producing those documents would have violated a protective order issued by United States District Court Judge Dale Ho. The Adams Campaign then joined in the CFB's request that the United States Attorney release those documents. Nothing in any of the materials produced by the Adams Campaign – or by anyone else – implicates the campaign in any intentional misconduct.

6. The agency's newfound "reason to believe" that the Adams Campaign violated the law is as fatally flawed as it was in *Adams I* – and for the same reason. As supposed evidence of misconduct, the CFB now relies primarily on the same dismissed federal indictment and criminal *charging* documents with respect to other individuals, which have no evidentiary weight. And then, unmistakably trying to circumvent this Court's constitutional analysis in *Adams I*, the CFB repeatedly falls back on opaque references to "sworn FBI Agent Affidavits" and the unspecified results of its own claimed "independent investigation" as "corroborative evidence" for the charges contained in the dismissed indictment. It is far from that. Having nothing else, the CFB heaps speculation upon conjecture and calls it proof. The CFB cannot rationally base its decision on a conclusory statement about its "investigation" without explaining a single fact it alleges to have uncovered.

7. Indeed, the second-hand and unsupported accusations that the CFB quickly stitched together to deny matching funds to the Adams Campaign do not even remotely indicate, much less support a reason to believe, that Mayor Adams or the Adams Campaign broke any law or the

3

agency's rules. In brazen disregard of this Court's admonition, the CFB has again impermissibly put the burden of proving its own innocence onto the Adams Campaign. That conduct is unconstitutional and the height of arbitrary and capricious governmental action. The CFB's funding denial must be annulled, and the agency must be held to account for its pernicious conduct.

## Jurisdiction and Venue

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1367. The Court has personal jurisdiction over the CFB pursuant to Fed. R. Civ. P. 4(k)(1)(A). Venue is appropriate in the district pursuant to 28 U.S.C. § 1391(b)(1) & (2).

## Parties

9. Plaintiff Eric Adams is the Mayor of the City of New York and a candidate for re-election in the general election to be held on November 4, 2025. He is a resident of Kings County, New York.

10. Plaintiff Eric Adams 2025 has its principal place of business at 120 Broadway, 28th Floor, New York, NY 10271.

11. Plaintiff Sharon Adams is a resident of Kings County and the Treasurer of the Adams Campaign.

12. Plaintiff Marietta Rozental is a resident of Kings County, New York who contributed $2,000 to the Adams Campaign.

13. Plaintiff Malcolm Adams is a resident of Kings County, New York who contributed $100 to the Adams Campaign.

14. Defendant New York City Campaign Finance Board is the entity established in 1988 by the New York City Campaign Finance Act to administer the New York City Campaign Finance Program. It has its principal office at 100 Church Street, New York, NY 10007.

## Nature of the Action

15. Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, the Adams Campaign brings this action against the CFB for damages and for declaratory and injunctive relief. As alleged in detail below, the agency has persistently violated the campaign's rights to freedom of speech and due process of law under the First and Fourteenth Amendments to the U.S. Constitution.[2] The Adams Campaign also seeks relief pursuant to article 78 of the New York Civil Practice Law and Rules ("Article 78") because the CFB's denial of its application for public matching funds was arbitrary, capricious, and contrary to law.

## Facts

16. The Campaign Finance Program was established by the New York City Campaign Finance Act in 1988 ("Campaign Finance Act"), which is codified as Chapter 7 of Title 3 of the New York Administrative Code.

17. The 2025 election for the Mayor of the City of New York is a "covered election" as that term is defined by the Campaign Finance Act.

18. On January 28, 2022, Mayor Adams filed a written certification with the CFB as required by the Campaign Finance Act.

19. Mayor Adams is a participating candidate as that term is defined by the Campaign Finance Act.

20. Eric Adams 2025 is Mayor Adams' principal committee as that term is defined by the Campaign Finance Act.

21. In a series of decisions commencing in November 2024, the CFB denied approximately

---

[2] In connection with its constitutional claims, and pursuant to 42 U.S.C. § 1988, the Adams Campaign further requests a monetary award for its costs and attorneys' fees incurred in bringing this case.

5

$3.5 in campaign matching funds requested by the Adams Campaign. The CFB based its decisions on three things: (i) Mayor Adams's failure to submit his financial dsclosure statement within the time required; (ii) the Adams Campaign's lage submission of a response to the CFB's request for documents; and (iii) the CFB's conclusion that it had "reason to believe" that the Adams Campaign had violated CFB rules and was therefore barred from receiving the requested funding. The "reason to bel.ieve" determination rested on a federal indictment entered against Mayor Adams, which was publicly unsealed on September 26, 2024. That indictment was dismissed with prejudice by the United States District Court for the Southern District of New York on April 2, 2025.

22. Despite the indictment's dismissal, however, the CFB notified the Adams Campaign on April 15, 2025 that the abandoned indictment nevertheless gave it "reason to believe that Eric Adams has, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or City law, including the Campaign Finance Act and Board Rules."

23. On May 27, 2025, Mayor Adams, the Adams Campaign, and several supporters and donors commenced *Adams I*, a hybrid Article 78 proceeding and action for damages in the New York State Supreme Court, Kings County, challenging the CFB's April 15, 2025, denial of matching funds ("*Adams I*").[3] They alleged that the agency's use of the dismissed federal indictment in finding a so-called "reason to believe" that Mayor Adams acted improperly was both arbitrary and capricious, and violated the free speech, due process, and equal protection guarantees of the New York State and Federal constitutions.

24. On June 16, 2025, the CFB removed *Adams I* to the United States District Court for the Eastern District of New York.

---

[3] The Adams Campaign filed an amended petition in Supreme Court on June 5, 2025.

25. Also on June 16, 2025, the CFB directed the Adams Campaign to produce by July 11, 2025, additional information regarding the charges contained in the dismissed indictment ("June Document Request"). The June Document Request was intentionally and unnecessarily onerous. It was an eight-page, single-spaced demand that, considering all its subparts, covered 60 discrete inquiries and extended as far back as seven years. A copy of the June Document Request is annexed to this complaint as Exhibit B.

26. By letter dated July 1, 2025 ("July 1 Letter"), while *Adams I* was pending in this Court, counsel for the Adams Campaign objected to the June Document Request, recognizing it as a transparent effort by the agency "to harass the [campaign] and create a false basis for denying public funds on the ground that the [campaign] ha[s] not responded to a request by the CFB for information." The July 1 Letter asked the CFB to withdraw the June Document Request. A copy of the July 1 Letter is annexed to this complaint as Exhibit C.

27. On July 3, 2025, the CFB rejected the Adams Campaign's bid for the agency to withdraw the June Document Request. A copy of CFB's July 3, 2025, letter is annexed to this complaint as Exhibit D.

28. The next week, this Court decided *Adams I*. Although the ruling upheld the CFB's denial of campaign matching funds because the Adams Campaign was late in responding to an agency information request and filing certain disclosure forms, the Court nevertheless concluded that the Adams Campaign had alleged viable free-speech and due-process claims against the CFB. According to the Court's decision, any reliance on the dismissed indictment as a basis for the agency to believe that Mayor Adams engaged in misconduct would have violated the mayor's constitutional rights and the rights of his campaign donors.

29. Following the Court's ruling, on July 11, 2025, the Adams Campaign asked the CFB to

extend its time to respond to the June Document Request until August 1, 2025. A copy of the July 11, 2025, letter from the Adams Campaign requesting an extension is annexed to this complaint as Exhibit E.

30. By letter dated July 14, 2025 ("July 14 Letter"), the CFB granted the requested extension. But the letter went further. Notably, even before the Adams Campaign had a chance to respond to the June Document Request, the CFB showed its predetermined hand. Foreshadowing things to come, the July 14 Letter warned that, "[u]ntil the [Adams] Campaigns provide a full and adequate response, including all responsive documentation and clarification noted below, CFB staff will recommend that the Adams 2025 Campaign has *not* demonstrated eligibility for a public funds payment" (emphasis added). A copy of the July 14 Letter is annexed to this complaint as Exhibit F.

31. Less than two weeks later, on July 25, 2025, counsel for the Adams Campaign commenced a rolling production of materials to the CFB that were responsive to the June Document Requests. The cover letter accompanying the documents ("July 25 Letter") explained that the Adams Campaign had been working closely with the attorneys who had represented it in connection the dismissed federal indictment to ensure the CFB received a comprehensive and complete response to the June Document Requests. The July 25 Letter also explained that, because a judicial protective order remained in place following the indictment's dismissal, the Adams Campaign was prohibited from supplying the CFB with third-party documents and communications received from the federal government during the prosecution, which were still subject to the court's restrictions. In addition, the July 25 Letter explained that the inability of the Adams Campaign to produce materials prior to that time arose partly from the fact that certain employees, consultants, or volunteers to the Campaign earlier had no access to their electronic

8

devices or other materials that might have been responsive to the CFB requests as a result of federal law enforcement's seizure of their property. A copy of the July 25 Letter is annexed to this complaint as Exhibit G.[4]

32. On August 1, 2025, the Adams Campaign completed its response to the June Document Request. Altogether, the Adams Campaign produced 114 pages of documents. The production of those documents by the Adams Campaign was a timely, complete, thorough, and good-faith response to the June Document Request.

33. By letter dated July 29, 2025, the CFB requested that the United States Attorney for the Southern District of New York authorize the release of the documents subject to the protective order. A copy of that letter is attached as Exhibit H.

34. By letter dated August 5, 2025, the Adams Campaign joined in that request. A copy of that letter is attached as Exhibit I.

35. On August 6, 2025, at approximately 10:00 a.m., the CFB Chairperson, Frederick Schaffer, issued a public statement that once again the CFB was denying the Adams Campaign public matching funds. According to Schaffer, Mayor Adams's campaign "failed to demonstrate eligibility for public funds payments at this time" supposedly because it "failed to provide requested information" to the agency and the agency had "reasons to believe that the campaign has violated the law with respect to the failure to provide requested information." Without giving any explanation or factual examples in support of the CFB's claims of misconduct, Schaffer further accused the Adams Campaign of "provid[ing] incomplete and misleading information to the CFB" and "impeding the CFB staff's ability to complete its investigation with respect to the second

---

[4] The July 25 Letter also responds to concerns raised by the CFB in the July 14 Letter regarding purported inconsistent statements made by counsel for the Adams Campaign.

round."

36. Schaffer's statement was spiteful, baseless, and predictable. It was the latest example of the CFB's unvarnished pre-judgment, which the agency has grossly demonstrated to the world for nearly a year. It sent a loud message to *all* New York City political candidates that the agency could exclude them from receiving public campaign matching funds for no other reason than it had the raw power to do so.

37. Later that day, the CFB issued a letter denying campaign matching funds to the Adams Campaign. A copy of that letter is attached as Exhibit J.

38. The next day, on August 7, 2025, CFB released its written explanation for its latest denial of matching funds to the Adams Campaign ("August 7 Supplemental Notice"). A copy of the August 7 Supplemental Notice is attached to this complaint as Exhibit K. The CFB also released a revised determination, a copy of which is attached as Exhibit L.

39. The August 7 Supplemental Notice, relying primarily on claims regarding the 2021 campaign rather than the 2025 campaign, tries to assassinate the character of the Adams Campaign and its members in two ways. First, exposing the clumsy "gotcha game" that the agency played with information requests during *Adams I*, the August 7 Supplemental Notice manufactures purported ambiguities in produced documents and supposed inconsistencies in statements by the Adams Campaign's counsel regarding document responses. Clinging to nothing more than the agency's biased and unsupported suspicions, the August 7 Supplemental Notice then takes a leap of imagination in surmising that the Adams Campaign withheld requested information and delayed the agency's investigation.

40. Those findings are false and unsupported by any evidence. The Adams Campaign fully complied in good faith with the June Document Request and supplied all responsive information

10

that was within its possession and control or explained why it was legally prohibited from producing certain materials. It was assisted by highly reputable counsel in gathering and producing that information to the CFB, and there is no evidence whatsoever that the campaign's attorneys engaged in any misconduct. Frustrated by the benign contents of the documents that were within the campaign's ability to produce, however, the CFB has indefensibly converted its own disappointment into a makeshift violation of the agency's rules.

41. One example of the CFB's disingenuous machinations is particularly revealing. In response to the June Document Request, the Adams Campaign informed the CFB that it could not produce materials that were subject to federal court protective order. Those protected materials contained information and statements by and about third parties which were presumptively confidential to protect individual privacy. Turning reality on its head, the CFB concluded that the campaign violated agency rules because it did not previously inform the agency of the protective order and thus supposedly delayed the CFB's investigation.

42. The premise of that claim is utterly absurd. The CFB followed the docket entries in that federal court criminal proceeding like a hawk and would have become aware of the protective order as soon as it was listed on the public docket. Indeed, the CFB was able to confer with the federal government during that prosecution and could have asked government attorneys about information that was relevant to any agency investigation into the Adams Campaign. As the agency acknowledges in the August 7 Supplemental Notice, "the CFB itself could have requested authorization from the Government, or made a motion before Judge Ho for access to the responsive material months ago." And the Adams Campaign consented to lifting the protective order so that the CFB could get access to the documents.

43. But the CFB did nothing. It never sought to obtain the documents on its own because it

never conducted any independent investigation. Instead, it unlawfully relied *solely* upon the dismissed federal indictment to deny the Adams Campaign public matching funds. And now, having been rebuked in *Adams I* for that misconduct, the CFB is taking another swing at it – only this time by trying to transform its own constitutional violation into a bogus claim that the campaign impeded the agency's investigation. There was no investigation to impede.

44. The 16 separate claims of statutory and regulatory violations listed in the August 7 Supplemental Notice that the CFB claims reason to believe were committed by the Adams Campaign are likewise the agency's recycled efforts to rely impermissibly on the dismissed federal indictment.

45. Fourteen of those sixteen legal violations expressly anchor the agency's so-called reason to believe that the campaign engaged in misconduct *on the dismissed federal indictment*. Trying to backfill the fatal gap in evidence needed to sustain those findings, the CFB cites the contents of several criminal charging documents relating to people tangentially involved with the Adams Campaign. Like the dismissed federal indictment, those charging documents also lack any evidentiary value. The CFB also broadly invokes FBI hearsay affidavits as proof of illegal activity without revealing what they actually say. And the agency goes so far as to proffer the unsworn resignation letter of the former U.S. Attorney for the Southern District of New York, in which she represents what additional charges the government intended to bring against Mayor Adams, but never did. In other words, despite having been admonished by the Court that an indictment cannot be used as proof of misconduct, the CFB now seeks to deprive the Adams Campaign of public matching funds charge based upon accusations that are not even contained in an indictment.

46. In the end, all the material that the CFB has hastily gathered to justify an improper decision that it had made long ago is both factually and legally insufficient to support its denial of

12

public matching funds to the Adams Campaign.

47. The August 7 Supplemental Notice nowhere demonstrates, for example, how the information the CFB now relies upon to penalize the Adams Campaign plausibly implicates Mayor Adams or any other controlling member of the Adams Campaign. By any reasonable measure, the spotty and attenuated allegations of misconduct contained in the August 7 Supplemental Notice do not supply adequate reason to believe that the Adams Campaign, as a formal enterprise, engaged in any wrongdoing.

48. Indeed, CFB Rule § 3-01(d)(ii)(B), upon which the agency relies here, expressly provides that "[t]he Board may determine that neither a pre-election nor post-election public funds payment will be paid to a candidate to a candidate if there is reason to believe that, in the course of Program participation, the *candidate* has engaged in conduct detrimental to the Program that is in violation of any other applicable law" (emphasis added).

49. In turn, CFB Rule § 1-02 provides that a candidate "means a candidate as defined in Article 14 of the New York State Election Law" (*i.e.*, the person running for office) and includes "every authorized committee of the candidate, the treasurer of each such committee, and any other *agent* of the candidate" (emphasis added).

50. Although the CFB Rules do not define the term "agent," in relevant part § 14-107(1)(g) of the New York State Election Law defines "agent" of the candidate to mean "a person authorized by the candidate, or the candidate's authorized committee."

51. Here, even considering all the extraneous, irrelevant, and speculative information upon which the CFB relied in denying the Abrams Campaign public matching funds, the agency has failed to show that there is any reason to believe that the "candidate," as that term is defined by CFB Rule § 1-02, or even an "agent" of the candidate, as that term is defined by New York Election

13

Law § 14-107(1)(g), engaged in any prohibited conduct.

52. Simply put, the CFB's overbroad application of its own rules makes the agency's denial of public campaign matching funds to the Adams Campaign completely unlawful and indefensible.

## FEDERAL LAW CLAIMS

### FIRST CAUSE OF ACTION

### The CFB's denial of public matching funds to the Adams Campaign violated the First Amendment's free speech protections.

53. The Adams Campaign repeats and realleges all the allegations contained in the complaint as if fully set forth here.

54. Campaign donations by private parties to political candidates constitute political speech, which is protected by the United States Constitution.

55. Campaign contributions represent protected speech both by the donor (as an expression of political support) and by the candidate (as an expression of political advocacy).

56. Governmental programs that provide public matching funds to political candidates who receive private contributions thus augment the protected speech of both donors and candidates.

57. Conversely, barring a candidate from receiving public matching funds necessarily burdens political expression safeguarded by the United States Constitution.

58. The CFB excluded the Adams Campaign from receiving public matching funds, and thereby infringed upon constitutionally protected speech, purportedly because: (i) the campaign failed to provide the agency with requested information; and (ii) the agency had reason to believe that the campaign violated the law by failing to provide requested information.

59. Those findings lack any factual basis and result from a misapplication of law. Consequently, the CFB's denial of public matching funds to the Adams Campaign was not narrowly tailored to achieve any legitimate governmental objective. The agency's actions did not

and could not curtail corruption, or even the appearance of corruption, because they violated the very rules promulgated to achieve those ends.

60. Undisciplined and overbroad administrative action of that sort violates the First Amendment.

## SECOND CAUSE OF ACTION

### The CFB's denial of public matching funds to the Adams Campaign violated the Fourteenth Amendment's due process protections.

61. The Adams Campaign repeats and realleges all the allegations contained in the complaint as if fully set forth here.

62. The CFB excluded the Adams Campaign from receiving public matching funds and thereby infringed upon constitutionally protected speech, purportedly because: (i) the campaign failed to provide the agency with requested information; and (ii) the agency had reason to believe that the campaign violated the law.

63. There is no evidence to support the agency's findings that the Adams Campaign failed to provide requested information that was within its possession or control.

64. Furthermore, as applied to the Adams Campaign here, CFB Rule § 3-01(d)(ii)(B) is unconstitutionally vague. The Adams Campaign could not be reasonably expected to anticipate that misconduct by people other than the candidate, who were not agents of the candidate, would support a reason to believe that the candidate violated the law.

65. The CFB's denial of matching funds to the Adams Campaign in the absence of such evidence violates the due process clause of the Fourteenth Amendment.

## STATE LAW CLAIM

### THIRD CAUSE OF ACTION

**The CFB's denial of public matching funds to the Adams Campaign should be annulled pursuant to Article 78 because the agency's decision was arbitrary, capricious, and contrary to law.**

66. The Adams Campaign repeats and realleges all the allegations contained in the complaint as if fully set forth here.

67. The CFB excluded the Adams Campaign from receiving public matching funds purportedly because (i) the campaign failed to provide the agency with requested information; and (ii) the agency had reason to believe that the campaign violated the.

68. The CFB had no evidence upon which to base those determinations and rested its decision on rank speculation. There is no evidence that the Adams Campaign withheld any requested information from the agency, except certain materials that the campaign was prohibited by a federal court order from disclosing to the CFB. And as to those materials, the Adams Campaign consented to the CFB seeking judicial relief from the protective order so that the campaign might lawfully provide any requested materials covered by the injunction.

69. Additionally, the CFB misapplied the agency's own rules by penalizing the Adams Campaign for alleged misconduct committed by individuals other than the "candidate," as that term is defined by New York State law and the agency's own rules.

70. Without any evidentiary support for rejecting the campaign's application for public matching funds, and by misapplying the governing law and regulations to penalize the Adams Campaign for the alleged misconduct of others, the CFB's action was arbitrary and capricious.

**WHEREFORE**, Plaintiffs seeks judgment:

(i)   annulling the CFB's denial of campaign matching funds to the Adams Campaign and

directing the CFB to grant them;

    (ii)   declaring that the CFB's denial of campaign matching funds to the Adams Campaign violated the free speech and due process protections as guaranteed by the U.S. Constitution;

    (iii)   awarding the Adams Campaign money damages in an amount to be determined at trial;

    (iv)   awarding the Adams Campaign the attorneys' fees and litigation expenses it has incurred in this action; and

    (v)   granting such and further relief as the Court deems just and proper.

**ABRAMS FENSTERMAN, LLP**
*Attorneys for Plaintiffs*

By: _____
Robert A. Spolzino, Esq.
Mary E. Desmond, Esq.
1 Metrotech Center, Suite 1701
Brooklyn, New York 11201
Tel.: (718) 215-5300
