**New York City Campaign Finance Board**
100 Church Street, 12th Floor, New York, NY 10007
212.409.1800 | www.nyccfb.info

Frederick P. Schaffer
*Chair*

Gregory T. Camp
Richard J. Davis
Lawrence Moskowitz
Dawn L. Smalls
*Members*

Paul Seamus Ryan
*Executive Director*

August 7, 2025

Sharon Adams
Eric Adams 2025
1043 E 101 Street
Brooklyn, NY 11236

**RE: 2025 Public Funds Payment Determination Supplemental Notice**

Based on a preliminary analysis, and as set forth in the Public Funds Nonpayment Determination and the Detail Payment Report, which you have already received, pursuant to Board Rules 3-01(d)(i)(A)(2) and 3-01(d)(ii)(B) as well as New York City Administrative Code § 3-703(1)(d), the Campaign Finance Board (the "Board") has determined that the Eric Adams 2025 campaign (the "Campaign") has not demonstrated eligibility for a public funds payment. This letter provides the Campaign with additional information regarding the nonpayment determination.

**I. Failure to Comply with Board Rule 3-01(d)(i)(A)(2) and New York City Administrative Code § 3-703(1)(d)**

Campaigns must provide to the Board, upon the Board's request and by the deadline set by the Board, documents, records, or other information that verifies campaign activity, and failure to do so can make a campaign ineligible for public funds pursuant to Board Rule 3-01(d)(i)(A)(2). The failure to provide the requested documents/information is a basis for ineligibility for public funds. The Board has the discretionary ability to excuse non-compliance only where a campaign has "demonstrate[d] that there is good cause that [requested documentation/information] cannot be provided."

As you know, on November 15, 2024, CFB staff sent a letter to the 2021 and 2025 Campaigns, requesting documents and information related to the allegations in the Adams Indictment and requiring a response by December 6, 2024 (the "November 15 Request"). On December 5, 2024, the 2025 Campaign replied that because the request "relate[d] specifically to events that were referenced in the Indictment [against Mayor Adams[1]]," it would not submit a response by the deadline.

Although the Adams Indictment was dismissed on April 2, 2025, the 2025 Campaign did not respond to the November 15 Request until 10:38 p.m. on April 14, 2025—130 days after the deadline set by the CFB

---

[1] "Eric Adams" and "Mayor Adams" are inclusive terms that where applicable, include not only the individual or candidate, but also the relevant mayoral campaign (2021 or 2025), campaign employees, and campaign agents.

1

and only a few hours before the April 15, 2025 Board meeting (the "April 14 Response"). In the 2025 Campaign's response, Vito Pitta stated that he represented Eric Adams 2021 ("the 2021 Committee") and Eric Adams 2025 ("the 2025 Committee") (jointly "the Committees"), and that they had no responsive documents that had not already been submitted to the CFB. The response stated that past and current employees, consultants, and agents of the Committees "who potentially could be in possession of any such responsive documentation" had been asked to produce any responsive documentation and that "[t]hese individuals all advised Counsel that they were in possession of no records which have not previously been provided to the CFB by the Committees." The response did not specify whether Mayor Adams had been contacted or asked to produce documents.

On April 11, 2025, CFB staff sent a letter to the 2021 and 2025 Campaigns, requesting documents and information related to certain fundraising events, a 2021 Campaign office, and contributions obtained through certain individuals and entities (the "April 11 Request"). The April 11 Request required a response by May 2, 2025. After requesting and receiving an extension of the response deadline, the 2025 Campaign responded on May 16, 2025 (the "May 16 Response"). In the response, Mr. Pitta again stated that the Committees had no responsive documents that had not already been submitted. He also stated that Counsel to the Committees had contacted past and current employees, consultants, and agents of the Committees for responsive documents, but again he did not state whether they had contacted Mayor Adams or whether Mayor Adams had searched his records for responsive documents.

On June 16, 2025, CFB staff sent a letter to the 2021 and 2025 Campaigns, requesting documents and information related to allegations contained in sworn FBI Agent Affidavits[2] and restating prior requests for documents and information in full as to Mayor Adams (the "June 16 Request"). The letter noted that the Campaigns' April 14 Response and May 16 Response had not stated whether Mayor Adams had been contacted and asked to produce relevant documentation responsive to the requests and advised the Campaigns that they must provide responsive documents from Mayor Adams. In addition, CFB staff asked for a list of current and past employees, consultants, and agents contacted by the Campaigns in connection with prior requests. The June 16 Request required a response from the Campaigns by July 11, 2025.

On July 2, 2025, Counsel to the Committees sent a letter and revised letter (both dated July 1, 2025) to CFB staff requesting that the CFB withdraw the June 16 Request for documents and information. On July 3, 2025, CFB staff sent a letter to the Campaigns 1) explaining that the CFB would not withdraw its June 16, 2025 Request, 2) asking Counsel to confirm that he represents Mayor Adams, and 3) asking Counsel to confirm that his April 14, 2025, May 16, 2025, and July 1, 2025 responses were submitted on behalf of Mayor Adams, as a member of the 2025 Campaign (the "July 3 Letter").

At 9:45 p.m. on July 11, 2025, Counsel to the Committees responded with a list of past and current employees, consultants, and agents of the Committees that had been asked to provide responsive documentation in response to the November 15 Request and the April 11 Request. The list included, among others, Mayor Adams, Brianna Suggs, Vito Pitta, Gladys Miranda, and Katie Moore. The July 11 Letter also requested an extension of the response deadline for the June 16 Request to August 1, 2025.

On July 14, 2025, CFB staff sent a letter to the Campaigns granting the request for an extension but 1) informing Counsel that the 2025 Campaign's failure to provide requested documentation could result in

---

[2] These affidavits were released by the Department of Justice on May 9, 2025 in connection with *United States v. Eric Adams* (24-cr-556) (S.D.N.Y.).

2

the Board finding the 2025 Campaign ineligible for public funds at the July 15, 2025 Board meeting and 2) requesting that the 2025 Campaign clarify certain inconsistencies in representations made to the CFB by the 2025 Campaign (the "July 14 Letter"). Specifically, CFB staff raised three concerns:

1. On July 10, 2025, during litigation in the Eastern District of New York, counsel for Mayor Adams stated that Mayor Adams had not been asked by the CFB to provide any responsive records. This statement conflicted directly with the Campaigns' assertion in their July 11 Response that Mayor Adams was among the individuals contacted by Counsel to obtain responsive documents. CFB staff asked for an explanation of these inconsistent statements and for the Campaign to state when Mayor Adams had been asked to provide responsive documents, when he completed his search, and to confirm that his search for responsive documents included documents provided to him by the government as part of discovery in *United States v. Adams*, No. 24-CR-556 (S.D.N.Y.).

2. The Campaigns' refusal to respond to the November 15 Request was based on advice of criminal counsel, given that the requests related specifically to events that were referenced in the Indictment, but following the dismissal of the Indictment, the Campaigns claimed that no responsive documents existed. CFB staff asked why the Campaigns had initially refused to respond to the November 15 Request if no responsive documents existed.

3. The list of individuals identified in the July 11 Response did not appear to be a complete or sufficient accounting of all agents, consultants, or others who may have had relevant knowledge or access to records concerning the Campaigns' activities. CFB staff asked for a more comprehensive identification of such individuals, including but not limited to Winnie Greco, Mohamed Bahi, Ahsan Chughtai, and Rana Abbasova.

On July 25, 2025, the Committees submitted a preliminary response to the June 16 Request and the July 14 Letter (the "July 25 Response"). On August 1, Mr. Pitta sent an email to CFB staff, asking whether the CFB staff had "received the initial submission and no additional information is being requested other than what has been identified in the document request." That same day, CFB sent an email to Mr. Pitta explaining that CFB staff would determine whether it required additional information after reviewing the materials provided by the Committees in response to the June 16 Request and July 14 Letter. Later on August 1, the Committees submitted a supplemental response to the June 16 Request and the July 14 Letter (the "August 1 Response").

The July 25 Response and August 1 Response show that the Campaign failed to comply with Board Rule 3-01(d)(i)(A)(2) and New York City Administrative Code § 3-703(1)(d) and that the Campaign has therefore failed to demonstrate eligibility for a public funds payment. Specifically, those Responses reveal the following omissions, inconsistencies, and misrepresentations in the Campaign's responses to the CFB's requests for information and documentation to date:

1. For the first time, and only in response to CFB staff's direct question, the Campaign's counsel stated that Mayor Adams is in fact in possession of discovery provided by the U.S. Attorney's Office for the Southern District of New York in *United States v. Adams*, No. 24-CR-556 (S.D.N.Y.), but that he cannot provide the CFB with those records because they are subject to a protective order. The Committees' prior statements that they were not in possession of any records responsive to the November 15 Request and the April 11 Request that had not previously been submitted to the CFB, were knowingly false. The Campaign should have notified the CFB that it was in possession of responsive documents, even if the documents could not be provided at that

3

time. The Protective Order provides that "[t]he Government may authorize, in writing, disclosure of Disclosure Material beyond that otherwise permitted by this Order without further Order of this Court." The Campaigns should have advised the CFB of the Protective Order earlier —at least as part of the April 14 Response to the November 15 Request, so that the CFB itself could have requested authorization from the Government, or made a motion before Judge Ho for access to the responsive material months ago. The Campaigns' failure to provide this material information has delayed the CFB's investigation by several months. The Campaign has not demonstrated good cause for 1) its failure to disclose the potentially responsive documents covered by the Protective Order and 2) failure to request authorization to disclose the relevant information to the Board prior to the submission of its April 14 Response to the November 15 Request.

2. As part of the July 25 Response and August 1 Response, the Campaign produced documents responsive to the November 15 Request and the April 11 Request from what appear to be, *inter alia*, the following custodians: Mayor Adams, Brianna Suggs, and Vito Pitta. Counsel to the Campaign previously represented that these custodians had been asked to search for and provide any responsive documents and that there were no responsive documents that had not already been provided to the CFB. This representation was apparently false. The April 14 Response to the November 15 Request and the May 16 Response to the April 11 Request were incomplete and the Campaign has offered no justification for why the records recently submitted were not previously provided.

3. In the July 25 Response, the Committees provided a list of 31 individuals that have now been contacted for responsive documents. In the July 11 Response, the Committees indicated that 12 individuals had been contacted. The Committees have provided no justification for why these additional 19 individuals, some of whom were named specifically in the November 15 and April 11 Requests (e.g., Rana Abbasova) were not previously contacted.

4. In the August 1 Response, Counsel stated that some of the individuals identified on July 25, 2025 as having been contacted to obtain responsive documents had provided documents, others had indicated that they had no responsive documents, others had not responded, and one had declined to provide materials on advice of counsel. The Campaigns' response to the CFB's requests is therefore incomplete. Absent information on which custodian invoked their Fifth Amendment rights, stated that they lack responsive documents, and failed to respond, the CFB cannot conduct a complete independent investigation. Information on who has invoked their Fifth Amendment rights or otherwise did not reply is crucial to the CFB's issuance of subpoenas *ad testificandum*.

5. The August 1 Response contains a screenshot of a text message regarding the September 20, 2023 fundraising event referenced in the November 15 Request. That request sought "all campaign communications relating to the event, including but not limited to those to or from Arda Sayiner." The text message is from "Arda Turkey," and one message on the screenshot reads "Hello Eric. If you are interested in these people I will invite them to NYC to meet you before or after the dinner I'm organizing for you in September." The screenshot appears to be an incomplete depiction of a larger text conversation and thus indicates that not all responsive documents have been produced to the CFB. Indeed, one of the text messages in the screenshot is truncated. The Campaign's response is therefore incomplete.

6. In response to the CFB's question regarding the Campaigns' inconsistent statements about whether or not Mayor Adams was asked to or needed to search for responsive documents, Counsel stated that he "understood the request for information to be requests for documents in possession of the

4

Committees, not any specific individuals associated with the Committees" including Mayor Adams. Yet Counsel simultaneously stated that the Committees did not respond to the November 15 Request because Mayor Adams had invoked his Fifth Amendment rights. This statement proves that the Committees *did* understand the Request to include Mayor Adams. It makes no sense to say Mayor Adams was invoking his rights if he was not being asked to produce material. And the Committees have not provided any explanation as to why the other individuals that have now been contacted and asked to produce documents could not have previously been contacted and asked to produce documents.

7. CFB staff has reviewed the July 25 Response and the August 1 Response and found that the 2025 Campaign failed to provide certain relevant and requested communications known by CFB staff to have occurred. *See* Attachment.

While each issue above independently shows that the Campaign has failed to comply with Rule 3-01(d)(i)(A)(2) and New York City Administrative Code § 3-703(1)(d), collectively they reflect a pattern of incomplete and misleading responses that has delayed the staff's investigation. There is no basis for the Board to excuse the Campaign's non-compliance.

**II. Reason to believe that, in the course of Program participation, the candidate has engaged in conduct detrimental to the Program that is in violation of any other applicable law.**

The Board has reviewed the September 26, 2024 indictment of Eric Adams (*see United States v. Adams*, 24 CR 556), a complaint alleging crimes committed by Mayor Adams' associate Mohamed Bahi in conjunction with an alleged straw donation scheme for Mayor Adams' 2021 mayoral campaign; an information alleging that Mayor Adams' associate Erden Arkan committed wire fraud, in conjunction with an alleged straw donation scheme for Mayor Adams' 2021 mayoral campaign; the transcript of Arkan's allocution in which he pled guilty to that crime; sworn affidavits by FBI Agents and other documents released by Judge Ho on May 9, 2025; the state criminal indictment charging Dwayne Montgomery and others with conspiracy in conjunction with an alleged straw donation scheme for the 2021 Campaign; Acting Deputy Attorney General Emil Bove's February 10, 2025 memorandum to the U.S. Attorney's Office for the Southern District of New York, instructing prosecutors to dismiss the charges against Mayor Adams; Former U.S. Attorney for the Southern District of New York Danielle Sassoon's February 12, 2025 resignation letter; Bove's February 13, 2025 letter accepting Sassoon's resignation; Nolle Prosequi, *United States v. Adams*, 24-CR-556 (DEH) (S.D.N.Y. Feb. 14, 2025); Judge Ho's April 2, 2025 Opinion and Order dismissing the charges against Mayor Adams with prejudice; documents and records received from the Campaigns in response to the CFB's requests for documentation; and other documents the Board has obtained in the course of its independent investigation into these matters.

The Board has independently considered the credibility of the facts alleged in these documents and the sources of those allegations. By applying the credibly alleged facts to the law, the Board has determined that there is reason to believe that Mayor Adams engaged in the following prohibited acts:

1. **Committed wire fraud, in violation of 18 U.S.C. § 1343:**

    The Board determined that there is reason to believe Mayor Adams committed wire fraud, in violation of 18 U.S.C. § 1343 because the Adams Indictment, Bahi Complaint, Arkan Information allege–and information obtained directly from the 2025 Campaign, other documents the Board has obtained in the

course of its independent investigation into these matters, and sworn FBI Agent affidavits provide corroborative evidence–that Mayor Adams engaged in multiple straw donation schemes for his 2021 and 2025 mayoral campaigns while a Program participant, which included making false disclosures to the Board via electronic means regarding the ultimate source of those contributions. There is also evidence that multiple donors involved in these alleged schemes had direct contact with Mayor Adams, 2021 and 2025 Campaign staffers, and 2021 and 2025 Campaign associates and advisors. Additionally, Mayor Adams electronically requested and received matching funds for multiple of these allegedly fraudulent donations.

Mayor Adams' alleged commission of federal wire fraud is detrimental to the Program since he requested and improperly received matching funds for his 2021 mayoral campaign for at least some of the alleged straw donations he received. Additionally, Mayor Adams' alleged use of straw donations harms the public's informational interest in ascertaining the identity of contributors to the 2021 Campaign and 2025 Campaign.

2. **Solicited, accepted, and/or received a contribution by a foreign national, in violation of 52 U.S.C. § 30121 as well as Board Rule § 5-03(d):**

The Board determined that there is reason to believe that Mayor Adams violated 52 U.S.C. § 30121 and Board Rule § 5-03(d) because the Adams Indictment alleges that in August 2021, Mayor Adams "directed" and "approved" a plan for his staffer to obtain contributions of foreign funds from a Turkish businessman who owned a Turkish for-profit educational conglomerate. This allegation is consistent with and corroborated by sworn statements from law enforcement providing evidence that 1) in September 2021, Mayor Adams allegedly received five donations of $2,000 each from employees of a university located in Washington, D.C. that is partnered with a university located in Turkey, 2) these contributions were made "in agreement with members of [Mayor] Adams' staff," and 3) they appear to be the culmination of attempts by Arda Sayiner, a Turkish national, to provide contributions to the 2021 Campaign from other Turkish nationals. Similarly, the Adams Indictment alleges that in a September 2023 scheme allegedly undertaken at Mayor Adams' direction, Arda Sayiner facilitated contributions from multiple other Turkish nationals to Mayor Adams' 2025 mayoral campaign by sending cash to the 2025 Campaign, which then distributed that cash to at least three straw donors. On top of this, text messages provided to the CFB by the 2025 Campaign show that 1) Mayor Adams' staffer Rana Abbasova and 2025 Campaign fundraiser Brianna Suggs were significantly involved in a fundraising event taking place on September 20, 2023, which resulted in a number of contributions to the campaign from individuals with names of Turkish origin, 2) Abbasova appears to have been involved in the mechanisms by which those contributions were submitted, and 3) on August 27, 2023, Abbasova described an upcoming fundraising event to Suggs as being hosted or organized by "Arda" Sayiner and attended by Sayiner's "close circle," "most of [whom]" "Mayor knows . . . from [T]urkey" and "who [have] business here as well." Thus, it appears that Mayor Adams' staff were knowingly organizing a fundraiser attended by Turkish nationals, at which Mayor Adams made a personal appearance. Further, based on research undertaken by CFB staff, the three individuals the 2025 Campaign reported as making contributions in conjunction with this event (Erdem Sahin, Deniz Turkbas, and Kursad Ece, all of whom appear in text messages between Abbasova and Suggs regarding this event) are all U.S. citizens. This inconsistency provides additional evidence that the individuals attending the fundraising event made contributions through U.S. citizen straw donors, potentially with assistance and coordination of Mayor Adams' staff, corroborating the allegations in the Adams Indictment.

Mayor Adams' alleged violation of 52 U.S.C. § 30121 and Board Rule § 5-03(d) is detrimental to the Program because it creates at least the appearance of potential *quid pro quo* corruption and harms the public's informational interest in knowing the identity of contributors to the 2021 and 2025 Campaigns. In particular, soliciting and receiving sizable contributions from a foreign entity would have enabled that entity to gain influence over Mayor Adams, regardless of whether that entity's interests aligned with the voters who elected him. Because Mayor Adams allegedly hid the true source of those contributions, this conduct prevented the public from fully determining the entities that provided financial support to the 2021 and 2025 Campaigns.

3. **Obstructed justice and engaged in a conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(b) and 1512(c)(1), and 18 U.S.C. § 371;**

    The Board determined that there is reason to believe that Mayor Adams violated 18 U.S.C. §§ 1512(b) and 1512(c)(1), as well as 18 U.S.C. § 371 on the basis that sworn FBI Agent Affidavits state that in June 2024, with Mayor Adams' apparent knowledge and potential instruction, Mayor Adams' aide Mohamed Bahi pressured individuals involved in a straw donation scheme to lie to the FBI about their involvement. In line with this information, the Feb. 12 Sassoon Letter claims that the U.S Attorney's Office obtained "evidence that Mayor Adams destroyed and instructed others to destroy evidence and provide false information to the FBI." This evidence appears strong enough that at the time of Sassoon's resignation, her office was preparing a superseding indictment that would "add an obstruction conspiracy count based on [this information]." Thus, evidence presents reason to believe that Mayor Adams obstructed justice, attempted to obstruct justice, and/or engaged in a conspiracy to obstruct justice by making efforts to hide his receipt of straw donations from law enforcement and investigators. Finally, sworn FBI Agent Affidavits describe how Mayor Adams may have engaged in obstruction behavior related to other matters, such as by deleting incriminating text messages and preventing law enforcement from obtaining and accessing his personal cell phone, as required by a search warrant.

    Mayor Adams' alleged involvement in a conspiracy and attempts to obstruct justice is detrimental to the Program because such conduct furthered his effort to improperly receive public funds in the 2025 election. As such, any successful attempts to obstruct justice by hiding this alleged conduct from law enforcement could lead to his improper procurement of matching funds.

4. **Engaged in bribery, in violation of 18 U.S.C. § 666(a)(1)(B):**

    The Board determined that there is reason to believe that Mayor Adams violated 18 U.S.C. § 666(a)(1)(B) because the Adams Indictment alleges—and sworn FBI Agent Affidavits provide corroborative evidence—that Mayor Adams solicited and received substantial gifts from an airline owned in largest part by the Turkish government in the form of free and steeply discounted luxury travel from 2015 through 2022, when he was Brooklyn Borough President, a mayoral candidate, and Mayor. The Adams Indictment also alleges that in exchange for these benefits, Mayor Adams used his status as a high-ranking elected official to allegedly successfully pressure FDNY—under threat of terminating the Chief of Department and Fire Prevention Chief—to open a building called the "Turkish House" for occupancy despite FDNY's evaluation that the building was not safe. These allegations are partially corroborated by sworn FBI Agent Affidavits, which describe how Mayor Adams intervened on behalf of the Turkish General Consul regarding the Turkish House after and at substantially the same time as his receipt of these gifts. Other potential instances of bribery with direct links to Mayor Adams' campaign for office include allegations (the first of which is also supported by sworn FBI Agent Affidavits) that Mayor Adams 1) solved regulatory problems for an individual who appears to

have provided straw donations on multiple occasions, and 2) gave the individual who arranged his alleged free travel benefits a spot on his mayoral transition committee, seemingly to ensure the continued receipt of such benefits.

Mayor Adams' alleged violation of 18 U.S.C. § 666(a)(1)(B) is detrimental to the Program because it constitutes *quid pro quo* corruption or the appearance thereof.

5. **Engaged in a conspiracy to commit wire fraud, commit bribery, and receive contributions from a foreign national, in violation of 18 U.S.C. § 371:**

The Board determined that there is reason to believe that Mayor Adams violated 18 U.S.C. § 371 by conspiring to commit wire fraud, bribery, and the solicitation, acceptance, and receipt of campaign contributions from foreign nationals, as alleged by the Adams Indictment. Many of the alleged actions relevant to a wire fraud conspiracy are outlined in the subsection on federal wire fraud above. The Adams Indictment also alleges that in October 2023, Mayor Adams attended a fundraiser where he directed his aide to coordinate the receipt of straw donations from another individual, a scheme that was ultimately not carried out due to the start of investigations into Mayor Adams' conduct. Additionally, sworn FBI Agent Affidavits describe–including with screenshots of text conversations—how Mayor Adams personally requested 20 donations of $250 from an individual in June 2024, which given that Adams' aide referred to this exchange as a request for a $5,000 contribution, was likely a request for straw donations. Finally, Mayor Adams' potential actions relevant to conspiracies to commit bribery and receive contributions from foreign nationals are illustrated above.

Mayor Adams' alleged violation of 18 U.S.C. § 371 is detrimental to the Program because it resulted in Mayor Adams improperly obtaining matching funds, creates the perception of a *quid pro quo* exchange, and harms the public's informational interest in disclosure of the 2021 Campaign's and 2025 Campaign's contributors. In particular, Mayor Adams' alleged conspiracy to commit wire fraud included requesting and receiving matching funds for his 2021 and 2025 mayoral campaigns for at least some of his alleged straw donations. Further, to the degree that conspiring to commit bribery does not actually constitute *quid pro quo* corruption, such conduct creates the appearance that a corrupt bargain may be in place. Finally, conspiring to solicit large, secret donations from a foreign entity harms the public's informational interest in ascertaining Mayor Adams' financial backers and may have enabled them to gain influence over him, again creating at least the impression of *quid pro quo* corruption.

6. **Failed to accurately disclose campaign transactions and the true identity of contributors, in violation of NYS Election Law §§ 14–102(1), 14-104(1), 14-108, and 14–120 and NYS BOE Rules §§ 6200.1(a)(2) and 6200.2:**

The Board determined that there is reason to believe that Mayor Adams violated NYS Election Law §§ 14-102(1), 14-104(1), 14-108, and 14-120 and NYS BOE Rules §§ 6200.1(a)(2) and 6200.2 because the Adams Indictment, Arkan Information, and Bahi Complaint allege that Mayor Adams knowingly accepted straw donations and submitted false statements to the Board on multiple occasions—including in an attempt to fraudulently obtain matching funds—for both his 2021 and 2025 mayoral campaigns. Sworn FBI Agent Affidavits corroborate these allegations by describing multiple instances of potential straw donation schemes, the organizers of which had direct contact with Mayor Adams' staffers, associates, and/or Mayor Adams himself. Finally, materials obtained from the 2025 Campaign and other sources provide additional support for these allegations through text messages and emails demonstrating coordination and contact between Mayor Adams' aide Rana Abbasova, 2021 and 2025

Campaigns fundraiser Brianna Suggs, individuals alleged or known to be involved in straw donation schemes, and Mayor Adams himself—indicating knowledge of these straw donation schemes on the part of the 2021 and 2025 Campaigns.

Mayor Adams' alleged conduct is detrimental to the Program because it resulted in his improper procurement of public matching funds—namely, Mayor Adams requested and received matching funds for at least some of the straw donations he is alleged to have received. Additionally, Mayor Adams' alleged concealment of the individuals behind certain contributions harms the public's informational interest in ascertaining the 2021 and 2025 Campaigns' financial backers.

7. **Accepted contributions from corporations doing business in New York State, in violation of NYS Election Law §§ 14-116(1):**

The Board determined that there is reason to believe that Mayor Adams violated NYS Election Law § 14-116(1) because the Adams Indictment alleges, and other evidence—including copies of reimbursement checks obtained by the CFB—confirms, that in the straw donation scheme facilitated and admitted to by Arkan in May 2021, Arkan's construction company indisputably reimbursed the straw donors for their contributions. According to the Arkan Information, Mayor Adams "knowingly accepted" these straw donations at a subsequent fundraiser. The July 25 Adams Response, sworn FBI Agent Affidavits, and other sources of information describe how 1) Arkan specifically wanted to hand the contribution checks to Mayor Adams' "secretary," and declined an offer to create a fundraising website in favor of a more "hands on" approach, 2) Arkan had direct communication with Mayor Adams, Brianna Suggs, and Rana Abbasova on multiple occasions, and 3) Arkan's employee texted with Brianna Suggs regarding how to address contribution checks. Because Arkan's construction company is Brooklyn-based, contributions received from that entity indisputably qualify as a prohibited contribution from a corporation engaged in business in New York State under this law. Sworn law enforcement affidavits, corroborated by bank records and communications showing contact and coordination between Arkan and the 2021 Campaign, provide irrefutable evidence that the 2021 Campaign received contributions from Arkan's Brooklyn-based LLC. Finally, this alleged incident occurred while Mayor Adams was a Program participant.

Mayor Adams' alleged violation of NYS Election Law § 14-116(1) is detrimental to the Program because it resulted in his improper procurement of matching funds. Specifically, the 2021 Campaign allegedly requested and received matching funds for 8 of the 10 straw donations received through the May 2021 straw donation scheme. Additionally, because the alleged corporate contributions were hidden through straw donations, this conduct also harms the public's informational interest in understanding the identity of entities providing financial support to the 2021 Campaign.

8. **Engaged in a conspiracy to promote his election through unlawful means, in violation of NYS Election Law § 17-152:**

The Board determined that there is reason to believe that Mayor Adams violated NYS Election Law § 17-152 because the Adams Indictment, Arkan Information, and Bahi Complaint contain allegations that Mayor Adams knowingly accepted straw donations and submitted false statements to the Board on multiple occasions for both his 2021 and 2025 mayoral campaigns. Sworn FBI Agent Affidavits provide support for these allegations. As demonstrated by the July 25 Adams Response and other materials, the significant amount of communication between Mayor Adams, 2021 and 2025 Campaign staff, Mayor Adams' personal staff, and individuals providing or coordinating straw donations, provides additional evidence that Mayor Adams and his staff were potentially aware of the fraudulent

nature of certain contributions received by the 2021 and 2025 Campaigns. Additionally, Mayor Adams requested and received matching funds for allegedly fraudulent straw donations in several instances. This alleged conduct involved multiple people—including 2021 Campaign and 2025 Campaign employees, donors, and Mayor Adams himself—and was arguably undertaken in order to promote Mayor Adams' election by increasing the funding available to his campaign.

Mayor Adams' alleged violation of NYS Election Law § 17-152 is detrimental to the Program because Mayor Adams requested and received matching funds for his 2021 mayoral campaign for at least some of the straw donations he is alleged to have received. As such, his alleged conduct resulted in his improper procurement of matching funds. Additionally, his alleged use of straw donations harms the public's interest in ascertaining the identity of the 2021 and 2025 Campaigns' financial supporters.

9. **Defrauded the government, in violation of NYS Penal Law § 195.20:**

The Board determined that there is reason to believe that Mayor Adams violated NYS Penal Law § 195.20 because the Adams Indictment, Bahi Complaint, and Arkan Information allege—and other reliable sources of information support—that Mayor Adams engaged in multiple straw donation schemes for his 2021 and 2025 mayoral campaigns, which included allegedly making false representations to the Board regarding the ultimate source of those contributions. Mayor Adams also requested and received matching funds for certain allegedly fraudulent straw donations, thereby obtaining government resources. Finally, because there are both allegations and evidence that this conduct occurred multiple times, it arguably constituted a "systemic ongoing course of conduct."

Mayor Adams' alleged violation of NYS Penal Law § 195.20 is detrimental to the Program because he requested and received matching funds for his 2021 mayoral campaign for at least some of the straw donations he is alleged to have received, thereby resulting in his improper procurement of matching funds. Additionally, Mayor Adams' alleged concealment of the individuals behind certain contributions harms the public's informational interest in determining the 2021 and 2025 Campaigns' financial supporters.

10. **Received bribes, in violation of NYS Penal Law §§ 200.10 and 200.12:**

The Board determined that there is reason to believe that Mayor Adams violated NYS Penal Law § 200.10 and/or NYS Penal Law § 200.12 because the Adams Indictment alleges—and sworn FBI Agent Affidavits provide corroborative evidence—that Mayor Adams solicited and received substantial gifts from an entity associated with the Turkish government in the form of free and steeply discounted luxury travel while Brooklyn Borough President, mayoral candidate, and Mayor. Further, the Adams Indictment alleges that the total value of these benefits exceeded $100,000. The large number of such instances described in sworn FBI Agent Affidavits may support the allegation that their total value exceeded $100,000. Further, the Adams Indictment alleges, and sworn FBI Agent Affidavits support, that Mayor Adams also successfully pressured FDNY to open a building owned by the Turkish Consulate for occupancy despite objections from FDNY's fire safety inspectors. Although the exact relationship between these two categories of action is unclear, the Adams Indictment alleges that they formed a *quid pro quo* agreement between Mayor Adams and a member of the Turkish government which appears to have provided his luxury travel benefits. Other potential instances of bribe receiving include incidents in which Mayor Adams 1) appears to have provided regulatory favors for an individual who allegedly provided straw donations and 2) according to the Adams Indictment, allegedly named the Turkish airline manager who arranged his free travel upgrades to his mayoral transition committee, seemingly to maintain his ability to receive such benefits.

Mayor Adams' alleged violation of NYS Penal Law § 200.10 and/or NYS Penal Law § 200.12 is detrimental to the Program because it constitutes *quid pro quo* corruption or the appearance thereof.

11. **Failed to accurately disclose contributor and intermediary information to the Board, in violation of NYC Admin. Code §§ 3-703(1)(d)(i)-(iv), 3-703(1)(g), and 3-703(6) and Board Rules §§ 3-01(e)(i)(A)–(C), 3-01(e)(ii), 4-01(b)(ii), 4-04, and 4-05(c)(ii):**

The Board determined that there is reason to believe that Mayor Adams violated NYC Admin. Code §§ 3-703(1)(d)(i)-(iv), 3-703(1)(g), and 3-703(6), in addition to Board Rules §§ 3-01(e)(i)(A)–(C), 3-01(e)(ii), 4-01(b)(ii), 4-04, and 4-05(c)(ii) because the Adams Indictment, Bahi Complaint, and Arkan Information make consistent allegations, supported by evidence obtained from the 2025 Campaign and other sources, including sworn FBI Agent Affidavits—that Mayor Adams accepted straw donations and submitted false statements to the CFB on multiple occasions for both his 2021 and 2025 mayoral campaigns, including in order to obtain matching funds for fraudulent contributions. Given the large number of individuals and entities allegedly involved in obtaining straw donations for the 2021 and 2025 Campaigns, there is also evidence that Mayor Adams failed to disclose intermediaries as required by city law. Finally, it also appears likely that the 2021 and 2025 Campaigns failed to disclose an in-kind contribution associated with a May 7, 2021 fundraising event and failed to accurately and completely disclose contributions raised at events that occurred on September 20, 2023 and October 9, 2023.

Mayor Adams' alleged violation of city laws mandating accurate disclosure of contributors and intermediaries to the Board is detrimental to the Program because it resulted in his improper procurement of matching funds. Specifically, Mayor Adams requested and received matching funds for his 2021 mayoral campaign for at least some of the straw donations he is alleged to have received. Additionally, the 2021 and 2025 Campaigns' alleged false disclosure of contributors harms the public's informational interest in ascertaining the identity of the 2021 and 2025 Campaigns' financial supporters.

12. **Accepted contributions in excess of the applicable limit, in violation of NYC Admin. Code § 3-703(1)(f) and Board Rule § 5-01(a):**

The Board determined that there is reason to believe that Mayor Adams violated NYC Admin. Code § 3-703(1)(f) and Board Rule § 5-01(a) because the Adams Indictment, Bahi Complaint, Arkan Information, and Montgomery Indictment, sworn FBI Agent Affidavits, and other information obtained by the CFB include evidence that Mayor Adams accepted contributions in excess of contribution limits on at least three occasions. In May 2021, Arkan indisputably facilitated ten straw donations of approximately $1,250 each. Additionally, the Arkan Information alleges that Mayor Adams "knowingly" accepted these contributions, an allegation that is supported by evidence of substantial contact–including about the at-issue contributions–between 2021 Campaign staff and associates, Arkan, Arkan's employees, and Mayor Adams himself. Were these properly attributed to Arkan, the total donated by him to the 2021 Campaign would be $12,500—far above the $2,000 per person contribution limit in place for the 2021 mayoral election. Similarly, the Adams Indictment alleges—and sworn FBI Agent Affidavits corroborate—that in December 2020, Tolib Mansurov allegedly contributed $10,000 to Mayor Adams' 2021 mayoral campaign by funneling $2,000 each through four of his employees. Again, the total amount donated by this individual is significantly more than the $2,000 contribution limit for that election. Finally, although the total amount donated by Dwayne Montgomery and his co-conspirators is unclear, the Montgomery Indictment alleges that Shamsuddin

11

Riza provided funds exceeding $2,000 in straw donations from July 2021 to October 2021. In addition to these instances, there are indications that the 2021 and 2025 Campaigns may have accepted contributions that exceeded the contribution limit on other occasions.

Mayor Adams' alleged conduct is also detrimental to the Program because it resulted in his improper procurement of public matching funds. As discussed, the 2021 Campaign requested and received matching funds for contributions received through the December 2020 straw donation scheme, and 8 of the 10 contributions received through the May 2021 straw donation scheme. Additionally, Mayor Adams' alleged concealment of the entities behind these large contributions harms the public's informational interest in determining the 2021 and 2025 Campaigns' financial backers.

13. **Accepted corporate contributions, in violation of NYC Admin. Code § 3-703(1)(l) and Board Rule § 5-03(a):**

The Board determined that there is reason to believe that Mayor Adams violated NYC Admin. Code § 3-703(1)(l) and Board Rule § 5-03(a) because the Adams Indictment alleges, and multiple other sources of evidence confirm, that Erden Arkan's construction company indisputably reimbursed the straw donors for their contributions in the straw donation scheme he admitted facilitating in May 2021. Additionally, the Adams Indictment alleges that in August 2021, Mayor Adams solicited and knowingly received at least three straw donations of $2,000 each from a Turkish for-profit conglomerate through U.S. citizens and green card holders it employed. While sworn FBI Agent Affidavits do not describe whether the funds obtained by the 2021 Campaign during this alleged scheme ultimately originated from a corporate entity, the Adam's Indictment allegation is consistent with evidence contained in those sworn law enforcement statements that 1) in September 2021, Mayor Adams allegedly received five donations of $2,000 each from employees of a university located in Washington, D.C. that is partnered with a university located in Turkey, 2) these contributions were made "in agreement with members of [Mayor] Adams' staff," and 3) they appear to be the culmination of attempts by Arda Sayiner, a Turkish national, to provide contributions to the 2021 Campaign from Turkish nationals.

Mayor Adams' alleged conduct is detrimental to the Program because it resulted in his improper procurement of matching funds. As discussed, the 2021 Campaign requested and received matching funds for 8 of the 10 straw donations received through the alleged May 2021 straw donation scheme. Further, because the corporate contributions Mayor Adams allegedly received were obtained through straw donations, Mayor Adams' alleged conduct harms the public's informational interest in knowing the identity of contributors to the 2021 and 2025 Campaigns.

14. **Engaged in financial transactions in conflict with the proper discharge of his duties as a public official, in violation of NYC Charter § 2604(b)(2):**

The Board determined that there is reason to believe that Mayor Adams violated NYC Charter § 2604(b)(2) because the Adams Indictment alleges—and sworn FBI Agent Affidavits corroborate—that Mayor Adams solicited and received substantial gifts from an entity associated with the Turkish government while Brooklyn Borough President, mayoral candidate, and Mayor. The Adams Indictment also alleges that as a result of these transactions, Mayor Adams successfully pressured FDNY to permit a building owned by the Turkish Consulate to be opened despite the FDNY's serious concerns about its safety for occupancy. Sworn FBI Agent Affidavits support this allegation by describing how Mayor Adams intervened with FDNY on behalf of the Turkish Consul General after and at substantially the same time as he received the aforementioned alleged travel benefits.

Mayor Adams' alleged conduct is detrimental to the Program because it amounts to a *quid pro quo* agreement (or the appearance thereof) between Mayor Adams and the Turkish entity or entities that allegedly provided free travel perks to Mayor Adams and benefitted from his alleged intervention with FDNY.

15. **Failed to disclose gifts to the NYC Conflicts of Interest Board, in violation of NYC Admin. Code §§ 12-110(b)–(d) and 12-110(d)(1)(h)(4) and Board Rule § 3-01(d)(ii)(A)(4):**

The Board determined that there is reason to believe that Mayor Adams violated NYC Admin. Code §§ 12-110(b)–(d) and 12-110(d)(1)(h)(4) and Board Rule § 3-01(d)(ii)(A)(4) because the Adams Indictment alleged, and sworn FBI Agent Affidavits included evidence, that Mayor Adams may have received substantial gifts from an entity associated with the Turkish government in the form of free and steeply discounted luxury travel from 2015 through 2022 as Brooklyn Borough President, mayoral candidate, and Mayor. The Adams Indictment alleges that Mayor Adams did not declare any financial benefits received from Turkish entities in COIB disclosure statements for 2016, 2019, and 2021. Mayor Adams' 2019 and 2021 COIB disclosure statements obtained by the CFB confirm that the Adams Indictment's allegation that he did not declare any gifts from Turkish entities for 2019 or 2021 is correct. Further, the Adams Indictment alleges, and sworn FBI Agent Affidavits provide corroborative evidence, that Mayor Adams also sought to disguise his receipt of free and discounted travel, including by sending communications that implied an intent to pay for travel benefits, even where records indicate that such payment did not occur.

Mayor Adams' alleged conduct is detrimental to the Program because the disclosure rules Mayor Adams allegedly violated are intended to eliminate opportunities for "prohibited conflicts of interest between public servants' official duties and their private interests," which could constitute *quid pro quo* corruption. By not declaring substantial gifts received while serving as Brooklyn Borough President and running for mayor, Mayor Adams hid such conflicts of interest—and potential *quid pro quo* agreements—from COIB and the public. As such, his violation of this law at least creates the appearance of potential *quid pro quo* corruption. Further, the submission of COIB disclosure statements is a prerequisite to a candidate's receipt of matching funds. *See* Board Rule § 3-05. Thus, Mayor Adams' alleged inaccurate and incomplete disclosure led to his improper procurement of matching funds. Finally, Mayor Adams' alleged insufficient disclosure harms the public's informational interest in ascertaining financial interests that may conflict with his official duties, which COIB disclosure rules are designed to promote. Thus, viewed individually and/or cumulatively, these alleged violations constitute conduct detrimental to the Program.

16. **Received prohibited gifts and used his position to obtain personal financial gain, in violation of NYC Charter §§ 2604(b)(3) and 2604(b)(5) and COIB Rules §§ 1-01(a) and 1-01(h)(l):**

The Board determined that there is reason to believe that Mayor Adams violated NYC Charter §§ 2604(b)(3) and 2604(b)(5) and COIB Rules §§ 1-01(a) and 1-01(h)(l) because there are both allegations and evidence that Mayor Adams solicited and received substantial gifts from an entity associated with the Turkish government in the form of free and steeply discounted luxury travel while Brooklyn Borough President, mayoral candidate, and Mayor. Further, the Adams Indictment alleges, and the general cost of international flight tickets and hotel stays corroborates, that each such alleged instance provided a benefit to Mayor Adams far in excess of $50. Finally, there is no indication that any of these alleged gifts were returned, with the potential exception of one allegedly cancelled trip in 2021.

Mayor Adams' alleged conduct is detrimental to the public funds matching program because the receipt of such substantial gifts from a single individual creates the perception of potential *quid pro quo* corruption.

These preliminary findings are not a final determination by the Board, but rather, a preliminary determination subject to review of ongoing financial activity and final audit.[3]

**You may petition the Board in writing** for reconsideration of this public funds determination. Your petition must state the grounds for reconsideration and may include a request to appear before the Board. In connection with any such petition, the Board encourages you to present any additional documents, affidavits, or arguments that support your campaign's eligibility to receive public funds. If the Board denies your petition, you have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules. *See* Admin. Code § 3-705(4); Board Rules 7-09.

If you have any questions, please contact me at jgallagher@nyccfb.info.

Thank you,

Joseph Gallagher
General Counsel

---

[3] See Admin. Code § 3-710; Board Rule 3-01(c).

14

**Responsive, Known Communications Not Received in Eric Adams 2021's and Eric Adams 2025's July 25 Response to the CFB's June 16, 2025 Request for Documentation**

**Documents Related to May 7, 2021 Fundraising Event Not Produced**

1. April 26, 2021 (or earlier / thereabouts) Brianna Suggs text communication with Georgia Kotsonis (employee of Erden Arkan)
   - Subject: Making checks payable to Eric Adams 2021
   - Sources:
     - FBI Agent Aff. No. 22-MAG-5134 (Doc. 191-04), ¶ 13(d)
     - CFB's Independent Investigation

2. May 7, 2021 (or thereabouts) Rana Abbasova communication with Reyhan Ozgur
   - Subject: List of contributions collected at May 7, 2021 fundraising event
   - Source: Adams Indictment, ¶ 30(e)

3. May 19, 2021 Rana Abbasova phone call with Erden Arkan
   - Subject: Unknown
   - Sources:
     - FBI Agent Aff. No. 21-MAG-12196 (Doc. 191-02), ¶ 11(d)
     - FBI Agent Aff. No. 22-MAG-1337 (Doc. 191-03), ¶ 13

4. May 20, 2021 Rana Abbasova email with Elif Ok, with Erden Arkan copied
   - Subject: Catering receipts and invoices
   - Sources:
     - FBI Agent Aff. No. 22-MAG-5134 (Doc. 191-04), ¶ 19
     - CFB's Independent Investigation

**Documents Related to September 20, 2023 Fundraising Event Not Produced**

5. Summer 2023 communication between Rana Abbasova and Eric Adams
   - Subject: Arda Sayiner could secure contributions for 2025 election campaign if Eric Adams attended in person fundraising event, along with alleged instruction from Eric Adams to devise plan to obtain those contributions
   - Source: Adams Indictment, ¶ 45(a)

6. Summer 2023 Rana Abbasova communication with Arda Sayiner
   - Subject: Securing contributions for 2025 election campaign if Adams attended in person fundraising event
   - Source: Adams Indictment, ¶ 45(a)

7. August/September 2023 Eric Adams calendar invite/entry from Brianna Suggs
   - Subject: September 20, 2023 fundraising event, including total raised
   - Source: Adams Indictment, ¶ 45(c)

8. September 20, 2023 video of fundraising event
   - Subject: Video of event in which Adams thanks attendee(s), potentially including one individual who lives in London and Istanbul
   - Source: Adams Indictment, ¶ 45(e)

**Documents Related to October 9, 2023 Fundraising Event Not Produced**

9. Late August 2023 through early September 2023 communications between Rana Abbasova and Brianna Suggs
   - Subject: The particulars of the October 9, 2023 fundraising event, including the creation of a unique fundraising link for the event, which Suggs ultimately created
   - Source: Adams Indictment, ¶ 45(a)
   - Note: Some communications produced but none related to creation of the fundraising link