UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Eric Adams 2025, Eric Adams, Sharon Adams, as Treasurer of Eric Adams 2025, Marietta Rozental, and Malcolm Adams, <br><br> Plaintiffs, <br><br> - against - <br><br> New York City Campaign Finance Board, <br><br> Defendant. | CIVIL ACTION NO. 25-CV-4588 (NGG) (LKE) |

## **DECLARATION OF PAUL S. RYAN IN SUPPORT OF ANSWER**

I, Paul S. Ryan, make the following declaration pursuant to 28 U.S.C. § 1746:

1.      I am Executive Director of the New York City Campaign Finance Board (the "Board" or "CFB" or "Defendant"). I am familiar with the facts underlying this action, and I make this declaration on personal knowledge in support of the Answer to the Complaint of Eric Adams 2025 (the "Adams Campaign"), Eric Adams, Sharon Adams, Marietta Rozental, and Malcolm Adams (collectively, "Plaintiffs").

2.      I submitted two declarations in connection with Plaintiffs' prior lawsuit against the CFB, *Eric Adams 2025 et al. v. New York City Campaign Finance Board*, No. 25-CV-3380 (NGG) (LKE) (E.D.N.Y.) ("*Adams I*"). For the sake of the completeness of the administrative record, I have repeated certain information from those declarations as the information is pertinent to the instant lawsuit as well.

**Background on the Campaign Finance Board and Voluntary Campaign Finance Program**

3.      The Board is an independent, non-partisan agency of the City of New York established in 1988 by the New York City Campaign Finance Act (the "Act") as codified in the New York City Administrative Code (the "Admin. Code") Title 3, Chapter 7, sections 3-701 *et seq*. and the New York City Charter (the "Charter"), Chapter 46, sections 1051 *et seq*., with its principal place of business at 100 Church Street, New York, New York 10007. The Board consists of five members who are appointed by the Mayor and the Speaker of the New York City Council. Admin. Code. § 3-708(1).

4.      The Board has rule making authority pursuant to Admin. Code § 3-708(8) and N.Y.C. Charter §§ 1051-52 to "promulgate such rules and regulations . . . as it deems necessary for the administration of this chapter." With that authority, the Board has promulgated the New York City Campaign Finance Board Rules (the "Board Rules"). Copies of the Board Rules in effect between March 17, 2023 and December 18, 2024 and in effect between December 19, 2024 and the present are attached hereto as Exhibits 1 and 2 respectively.

5.      Pursuant to the Charter, the Act, and the Board Rules, the Board administers New York City's voluntary Campaign Finance Program (the "Program"),[1] which seeks to limit the role and corrupting influence of private money in the political process by providing public matching funds to candidates running for New York City public office (Mayor, Comptroller, Public Advocate, Borough President, and City Council) who satisfy various eligibility requirements. *See* Admin. Code §§ 3-702(3), 3-703, 3-705.

---

[1] This Declaration also refers to the Campaign Finance Program as the Matching Funds Program.

6.      The Board's mission statement is "to mak[e] our local democracy more open, transparent, and equitable" and to "eliminate barriers to participation by providing access to the information and resources New Yorkers need to vote or run for office, and reduce the corrupting influence of money in politics by enhancing the impact of New Yorkers' small-dollar contributions." As stated on its website, "NYC's matching funds program amplifies the voice of average New Yorkers in city elections by matching their small contributions with public funds. By increasing the value of small-dollar contributions, the program reduces the possibility and perception of corruption from large contributions and unlimited campaign spending, and encourages citizens from all walks of life to run for office. Through its rigorous oversight and enforcement efforts, the [Board] holds candidates accountable for using public funds responsibly."[2]

7.      To qualify for public matching funds under the Program, a participating candidate running for Mayor must, *inter alia*, meet all the requirements for placement on the ballot, be opposed by another candidate, and demonstrate significant support from the public by meeting a two-part fundraising threshold: (1) collecting at least 1,000 "matchable contributions"[3] (of $10 or more) from New York City residents and (2) raising at least $250,000 in matchable contributions. Admin. Code § 3-703(1), (2).

8.      To qualify for public matching funds under the Program, participating candidates must also file a written certification stating that they are choosing to participate in the Program and agree to comply with the requirements for the provision of such funds (i.e., the Act and the

---

[2] *See* New York City Campaign Finance Board, "*About the CFB*," https://www.nyccfb.info/about (last visited August 26, 2025).

[3] Matchable contributions are defined in Admin. Code § 3-702(3).

Board Rules), which include, but are not limited to: (a) obtaining and furnishing to the Board accurate information relating to campaign expenditures or contributions; (b) not accepting over-the-limit contributions; (c) not accepting prohibited corporate contributions; (d) responding to Board staff's requests for information and documentation; and (e) fulfilling the requirements of section 12-110 of the Admin. Code, relating to the filing of disclosures with the New York City Conflicts of Interest Board ("COIB"). *See* Admin. Code §§ 3-703(1)(c), (1)(d), (1)(f), (1)(g), (1)(m), (6).

9.      A "principal committee," such as Eric Adams 2021 or Eric Adams 2025, is a corporation, committee, political club, or combination of one or more individuals that has been "authorized by" a candidate "to aid or take part in the election of such candidate" and has been designated by the candidate as the principal committee. Admin. Code § 3-702(2); *see also id.* §§ (7), (11). A principal committee "shall be the only committee authorized by such candidate to aid or otherwise take part in the election(s) covered by the candidate's certification [into the Matching Funds Program]," "shall not be an authorized committee of any other candidate," and "shall not have been authorized or otherwise active for any election prior to the election(s) covered by the candidate's certification." Admin. Code § 3-703(1)(e).

10.      As defined by the Campaign Finance Act and Board Rules, the entities relevant to a campaign for office are overlapping and inextricable. For example, the Campaign Finance Act at various times describes the "campaign[]," "candidate," and "committee" as the entities receiving or qualifying for public funds pursuant to the Program, making expenditures, and receiving contributions. *See, e.g.*, Admin. Code § 3-702(3) (using "candidate"); *id.* § (6) (using "candidate" and "committee"); *id.* § (12) (using "candidate" and "committee"); *id.* § (21)(a) (using "campaign" and "candidate"), *id.* § (22) (using "candidate"). In line with this approach,

4

the Board Rules define "candidate" as an inclusive term that means not only the individual running for office, but also their authorized committee(s), authorized committee treasurer(s), and any agents of the candidate. Board Rule 1-02.

11.    The candidate and his or her committee are obligated to respond to Board inquiries. Admin. Code § 3-703(1)(d). The Adams 2025 Committee is an alter ego for Mayor Adams that allows him to obtain contributions, make expenditures, and otherwise run his campaign. *See* Board Rule 1-02 (defining "Candidate" as including "authorized committee[s]"). When Mayor Adams voluntarily joined the Matching Funds Program, as is required of all candidates who take part in the Matching Funds Program, he certified that: (a) he is responsible for complying with the applicable sections of the Charter, the Act, and the Board Rules, (b) he must satisfy all the requirements before he can obtain matching funds, and (c) he is responsible for his campaign's compliance (including the compliance of any his agents) with the Charter, the Act and the Board Rules. A copy of Mayor Adams's 2025 Certification dated January 3, 2025 is attached as Exhibit 3.

12.    Mayor Adams acknowledged that he, the candidate, is "responsible for reading, understanding, and complying with" applicable sections of the New York City Charter, the Act, and the Campaign Finance Board Rules. Mayor Adams also acknowledged that "to receive public funds in the [covered] election(s)," he, the candidate, "must satisfy the other conditions specified in the Act and Rules before [he] may receive public funds." Ex. 3 at 1. Finally, Mayor Adams specifically acknowledged that he, the candidate, is "responsible for [his] campaign's compliance with the Charter, the Act, and the Rules." *Id.* at p. 2.

13.    The Board Rules further provide additional mandatory and discretionary eligibility criteria for public matching funds. *See* Board Rules Ch. 3. Pertinent here:

a.  Board Rule 3-01(d)(i)(A)(2) provides that "public funds will not be paid to a candidate" who fails to "provide to the Board, upon its request and by the deadline set forth by the Board, documents or records required by Chapter 4 of these rules, or other information that verifies campaign activity."

b.  Board Rule 3-01(d)(i)(A)(3) provides for mandatory ineligibility for public funds where "the difference between the candidate's reported receipts and documented receipts . . . exceeds a maximum threshold percentage," which is set by the Board "on or before July 11 in the year before the year of the election. For the 2025 election cycle, the maximum threshold percentage for a variance in receipts is 10%.[4]

c.  Board Rule 3-01(d)(ii)(A)(4) provides for mandatory ineligibility for public funds where "the candidate fails to demonstrate compliance with § 12-110 of the [Admin.] Code, as required pursuant to § 3-703(1)(m) of the [Admin.] Code and section 3-05." Rule 3-05 provides, in relevant part, that a candidate "must demonstrate compliance with" those provisions of the Code "3 days prior to the next [matching funds] payment date."

d.  Board Rule 3-01(d)(i)(B) provides that the Board may deny a public funds payment "to a candidate if there is reason to believe that the candidate has committed a violation of the Act or these rules not otherwise enumerated in

---

[4] *See* New York City Campaign Finance Board, "*2025 Elections: What Participating Candidates Need to Know About Public Funds Payments*," at 11, available at https://www.nyccfb.info/candidate-services/guidance/ (noting the 10% threshold) (last visited August 26, 2025).

paragraph (ii) of this subdivision, and which is not a basis for withholding pursuant to section 7-06."

e.  Board Rule 3-01(d)(ii)(B) provides that the Board may deny a public funds payment "to a candidate if there is reason to believe that, in the course of Program participation, the candidate has engaged in conduct detrimental to the Program that is in violation of any other applicable law."

14.  Before a candidate can receive matching funds, the Board must determine that the candidate has "met all eligibility requirements set forth in the Act and [the Board Rules]." Board Rule 3-01(a).

15.  Board Rule 7-09(a) provides that, "[a]fter the Board provides a written determination to a candidate specifying the basis for payment or non-payment of public funds prior to the election, the candidate may petition the Board in writing for reconsideration of such determination." It also states that the petition must "include either a request to appear before the Board concerning the petition or a statement that the candidate waives such candidate's right to appear."

16.  Participating candidates who qualify for matching funds receive $8 in public funds for every dollar a New York City resident gives, up to $250 per contributor to a mayoral candidate. Admin. Code §§ 3-705(1), (2)(a).

17.  There are 13 payment dates for the 2025 election cycle to ensure that candidates have ample opportunities to present their eligibility to the Board.

18.  On each payment date, the Board reassesses the participant's eligibility for public matching funds (including funds that may have been disbursed on a prior payment date) based on an assessment of compliance with the Campaign Finance Act and Board Rules as of the payment

date. Between each payment date, campaigns submit disclosure statements, update documentation, and correct any errors that may lead to a determination of public funds ineligibility. This means that the most recent payment determination is considered the operative determination by the Board and the only determination ripe for review. With respect to the Adams Campaign, the payment determination made on August 28, 2025 is the operative determination because it is the most recent.

19.     Mayor Adams was a Program participant from June 10, 2013 (the date on which he certified into the Program as a candidate for Brooklyn Borough President in the 2013 election) through December 31, 2017 (the end of his first term as Brooklyn Borough President, an office that he achieved as a Program participant) and from September 18, 2019 (the date on which he certified into the Program as a candidate for Mayor in the 2021 election) onward.

20.     On each of the payment dates alluded to in the Complaint (December 16, 2024, January 15, 2025, February 18, 2025, March 17, 2025, April 15, 2025, July 15, 2025, and August 6, 2025), the Board determined that several candidates, including Mayor Adams, had not demonstrated their eligibility for payment as of that day. *See* Compl. ¶¶ 1-2, ECF No. 1.

**Adams Campaign Nonpayment Determinations Reviewed in *Adams I*: December 2024 – April 2025**

21.     On September 26, 2024, a five-count indictment (the "Indictment") against Eric Adams was unsealed in the Southern District of New York.[5] The Indictment charged Mayor Adams with wire fraud, bribery, campaign finance violations involving contributions from foreign nationals, and conspiracy to commit the aforementioned crimes. Among other things, the

---

[5] U.S. Attorney's Office, Southern District of New York, "*New York City Mayor Adams Charged with Bribery and Campaign Finance Offenses*," https://www.justice.gov/usao-sdny/pr/new-york-city-mayor-eric-adams-charged-bribery-and-campaign-finance-offenses.

Indictment alleged that Mayor Adams was part of a scheme to use straw donors to hide illegal contributions and get matching funds. A copy of the Indictment is attached as Exhibit 4.

22.     Under the Campaign Finance Act and the New York City Charter, the Board is vested with the power to "investigate all matters relating to the performance of its functions," including through the issuance of subpoenas related to such investigations. Admin. Code § 3-708(5); *see* N.Y.C. Charter Chapter 46 § 1052(a)(5) ("The board shall have the power to investigate all matters relating to the performance of its functions and any other matter relating to the proper administration of any voluntary system of campaign finance reform established by local law and for such purposes shall have the power to require the attendance and examine and take the testimony under oath of such persons as it shall deem necessary and to require the production of books, accounts, papers and other evidence relative to such investigation."); Admin Code § 3-710(1) ("The [Board] is hereby empowered to audit and examine all matters relating to the performance of its functions and any other matter relating to the proper administration of this chapter and of chapter 8 of title 3 of the code. . . ."); *see also* Board Rule 12-01. Further, a "candidate's failure to keep or provide records or other information to the Board, upon its request or as required by these rules, may result in a determination that matchable contribution claims are invalid . . . ." Board Rule 4-04.

23.     On November 15, 2024, Jesse Schaffer, Director of Special Compliance for the Board, sent a letter to Vito Pitta, counsel to the Adams Campaign, requesting documents and information related to the allegations in the Indictment, to verify campaign activity described in the Indictment, and to better inform the Board's decision regarding public funding eligibility. A copy of this letter is attached as Exhibit 5 (the "November 15th Request"). Mr. Schaffer stated, that "[b]ased on the indictment, there is reason to believe that the [2021 and 2025] Campaigns

committed violations of various federal statutes, Campaign Finance Act provisions, and Board Rules, which would make the 2025 Campaign ineligible to receive a public funds payment on December 16, 2024. In connection with the Board's consideration of this issue, please provide the documents listed below, as well as any other documents, affidavits or arguments that support the 2025 Campaign's eligibility to receive public funds." The letter required a response by December 6, 2024.

24.     On December 5, 2024, Mr. Pitta left Mr. Schaffer a voicemail stating, "I'm calling regarding your November 15th letter requesting additional information from Eric Adams 2021 and 2025. After consultation with criminal counsel, given that the requests relate specifically to events that were referenced in the Indictment, this is not something that we can respond to at this time. If you want to discuss further please give me a call at 212-652-3881. I'll also send you an email confirming that I left you this voice mail, but wanted to let you know that we won't be able to submit a response by the requested deadline tomorrow." Shortly thereafter, Mr. Pitta sent Mr. Schaffer an email confirming that he had left a voicemail regarding the November 15th Request. Mr. Schaffer responded the same day confirming receipt of the voicemail. A copy of this email exchange is attached as Exhibit 6.

25.     On December 6, 2024, Board staff submitted to the Board a privileged and confidential legal memorandum analyzing the implications of the Indictment on the Adams Campaign's public funding eligibility. Board staff also conveyed that, on December 5, 2024, the Adams Campaign informed Board staff that it would not respond to the November 15th Request for the reasons stated in Mr. Pitta's December 5, 2024 voicemail.

26.     On December 13, 2024, I participated in a virtual meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the

Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; and (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board.

27.    On December 16, 2024, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign. As reflected in a Board press release issued on the same day, Board Chair Frederick Schaffer stated at the meeting: "After thoroughly reviewing all available information, including the details of the indictment of Mayor Adams, the Board has determined there is reason to believe the Adams campaign has engaged in conduct detrimental to the matching funds program, in violation of law, including the Campaign Finance Act and Board Rules. His campaign also failed to provide documents and information requested by the Board. Accordingly, Mayor Adams's campaign for reelection has failed to demonstrate eligibility for public funds payment at this time . . . Our priority remains achieving an equitable and transparent democracy that is accountable to all New Yorkers." A copy of this press release is attached as Exhibit 7.[6]

28.    On December 16, 2024, Board staff issued an Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 8 (the "December 16th Nonpayment Determination").[7]

_____

[6] For ease of reference, some exhibits that were attached to the Complaint have also been attached to this Declaration.

[7] The December 16th Nonpayment Determination mistakenly did not include the correct reasons for the nonpayment determination. It says instead, "[t]he Campaign is not eligible for

29.    On December 18, 2024, the Board's Director of Auditing and Accounting sent the Adams Campaign a Supplemental Notice regarding the nonpayment determination. A copy of that document is attached as Exhibit 9 (the "December 18th Notice"). The December 18th Notice,[8] states, in relevant part:

> The Board has reason to believe that Eric Adams (the "Candidate") has, in the course of public funds program (the "Program") participation, engaged in conduct detrimental to the Program that is in violation of federal and City law, including the Campaign Finance Act and Board Rules, as described in the September 26, 2024 indictment of Eric Adams (*see United States v. Adams*, 24 CR 556), and is therefore ineligible for a public funds payment. Pursuant to Board Rules 3-01(d)(i)(G) and (ii)(I), the Board's reason to believe that the Candidate has violated federal and City laws is a basis for ineligibility for public funds.

---

payment because of preliminary findings of substantial violations which may result in penalties" and cites to Board Rules 3-01(d)(i)(G), (ii)(H), and 3-01(e), which were not the basis for the Board's nonpayment determination. The Early Public Funds Nonpayment Determinations that are sent to candidates by Board staff are automatically generated based on codes that the Board staff uses in making their payment recommendations to the Board, which are adopted or rejected when the Board votes. Here, the code at issue was "Withholding For Non Compliance," which automatically generated the language in the December 16th Nonpayment Determination. This mistake also appears in the Early Public Funds Nonpayment Determinations that were issued on January 15, 2025, February 18, 2025, March 17, 2025, April 15, 2025, and July 15, 2025. Each of these documents should have said (in addition to other reasons for nonpayment correctly described):

- "The Campaign is not eligible because the Board has reason to believe that the Candidate has, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of law, including the Campaign Finance Act and Board Rules."

- "The Campaign is not eligible for payment because it failed to provide to the Board, upon its request, documents, records, or other information that verifies campaign activity by the deadline set forth by the Board."

The mistake was corrected as to the April 15, 2025 Early Public Funds Nonpayment Determination after the Adams Campaign filed a petition for reconsideration of the April determination. The December 18th Notice contained the correct bases for the Board's December 2024 determination.

[8] The December 18th Notice cites to Board Rules 3-01(d)(i)(G) and (ii)(I), which were in effect at that time. *See* Ex. 1. On December 19, 2024, an amended version of the Board Rules went into effect. Nearly identical versions of the Rules cited in the December 18th Notice can now be found at Board Rule 3-01(d)(i)(B) and 3-01(d)(ii)(B). *See* Ex. 2.

The indictment details and establishes probable cause that the Candidate committed the federal law crimes alleged in the indictment and, therefore, establishes reason to believe that, in the course of Program participation in the 2021 and 2025 election cycles, the Candidate engaged in conduct detrimental to the Program in violation of applicable laws, including:

- Conspiracy to commit wire fraud to obtain matching funds, accept a campaign contribution by a foreign national, and commit bribery.
- Wire fraud to obtain matching funds.
- Solicitation, acceptance or receipt of contributions by foreign nationals.
- Bribery.

The indictment details New York City law violations that were necessary predicates to the alleged federal crimes and, therefore, establishes reason to believe that, in the course of Program participation in the 2021 and 2025 election cycles, the Candidate engaged in conduct detrimental to the Program in violation of the Campaign Finance Act and Board Rules. Campaigns are required to report and document contributions accurately and completely and file accurate disclosure statements, and are prohibited from accepting contributions in violation of amount limits and source restrictions. The indictment details instances of the Adams campaigns concealing straw donations and contributions from foreign nationals, submitting these contributions for match, and filing false disclosure statements. Therefore, there is reason to believe that the Candidate and his campaigns were in violation of numerous provisions of the Campaign Finance Act and Board Rules, among other City laws.

30.    Further, the December 18[th] Notice states, "[c]ampaigns must provide to the Board, upon its request, documents, records, or other information that verifies campaign activity and failure to respond can make a campaign ineligible for public funds pursuant to Board Rule 3-01(d)(i)(B)."[9] Ex. 9 at 2. It explained that the Adams Campaign had not responded to the Board's November 15[th] Request and stated, "[t]his failure to respond to a request for information is a basis for ineligibility for public funds." *Id.*

---

[9] The December 18[th] Notice cited to the version of Board Rule 3-01(d)(i)(B) which was in effect at the time. An updated version of this Rule appears at Board Rule 3-01(d)(i)(A)(2).

31.     The December 18th Notice and the December 16th Nonpayment Determination advised the Adams Campaign of its right to submit a petition for reconsideration to the Board, and of Mayor Adams's right to appear before the Board regarding the petition, pursuant to Board Rule 7-09. They further advised that if the petition was denied, the Adams Campaign would have four months to challenge the Board's determination in New York State Supreme Court pursuant to Article 78 of the Civil Practice Law and Rules. *See Id.*; Ex. 8.

32.     The Adams Campaign did not file a petition for reconsideration of the December 2024 Nonpayment Determination.

33.     On the morning of January 15, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; and (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board.

34.     Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

35.     On that same day, Board staff issued another nonpayment determination to the Adams Campaign. A copy of this nonpayment determination is attached as Exhibit 10 (the "January 15th Nonpayment Determination"). The next day, Board staff sent the Adams Campaign a Supplemental Notice regarding the denial of public funds (the "January 16th Notice"). A copy of the January 16th Notice is attached as Exhibit 11.

36.     The January 16th Notice referred to the same Board Rules governing eligibility for public funds payment as the December 18th Notice and referred back to the December 18th Notice for an explanation regarding the nonpayment determination.[10]

37.     The January 15th Nonpayment Determination and the January 16th Notice again advised the Adams Campaign of its right to petition for reconsideration of the determination and to appear before the Board regarding the same. *See* Exs. 10 and 11.

38.     The Adams Campaign did not file a petition for reconsideration of the January 15th Nonpayment Determination.

39.     On the morning of February 18, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board; (3) the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB; and (4) the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%.

---

[10] In its citation to the Board Rules, the January 15th Nonpayment Determination and January 16th Notice mistakenly cited to the Rules in effect between March 17, 2023 and December 18, 2024. The nonpayment determinations issued to the Adams Campaign in February 2025, March 2025, and April 2025, and the supplemental notice issued in February 2025 also contained this mistake.

40.     Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

41.     On February 18, 2025, Board staff issued another Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 12 (the "February 18th Nonpayment Determination"). On the same day, staff also issued a Supplemental Notice regarding the nonpayment determination (the "February 18th Notice"). A copy of the February 18th Notice is attached as Exhibit 13.

42.     The February 18th Nonpayment Determination and the February 18th Notice collectively explained that the Adams Campaign was not eligible for payment for four reasons[11] — the two reasons previously described in the December 18th Notice, and:

    a.  The Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB. *See* Admin. Code. § 3-703(1)(m), 12-110.

    b.  The difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%. *See* Admin. Code §§ 3-703(1)(d), (6).

43.     Like the prior nonpayment determinations and notices, the February 18th Nonpayment Determination and the February 18th Notice also advised the Adams Campaign of its right to submit a petition for reconsideration to the Board, and of Mayor Adams's right to appear before the Board regarding the petition, pursuant to Board Rule 7-09. *See* Exs. 12 and 13.

44.     The Adams Campaign did not file a petition for reconsideration of the February 18th Nonpayment Determination.[12]

---

[11] As mentioned *supra* footnote 7, one additional reason for nonpayment appeared in the February 18th Nonpayment Determination but inclusion of that reason was a mistake.

[12] Plaintiffs did not challenge the February 18th Nonpayment Determination in *Adams I.*

45. On the morning of March 17, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board; (3) the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB; and (4) the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%.

46. Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

47. On that same day, the Board issued another Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 14 (the "March 17th Nonpayment Determination").

48. The March 17th Nonpayment Determination cited three reasons for the nonpayment determination. First, the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB. *See* Admin. Code. § 3-703(1)(m). Second, the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%. *See* Admin. Code §§ 3-703(1)(d), (6). Third, as explained, *supra* footnote 7, the document mistakenly referred to preliminary findings of substantial violations and failed to reference two reasons for the nonpayment determination: (1) the Board had reason

17

to believe that the Candidate had, in the course of public funds program participation, engaged in conduct detrimental to the Program that was in violation of law, including the Act and Board Rules; and (2) the Adams Campaign had failed to provide the Board, upon its request, documents, records, or other information that verified campaign activity by the deadline set forth by the Board.

49.    The March 17th Nonpayment Determination advised the Adams Campaign of its right to submit a petition for reconsideration to the Board, and of Mayor Adams's right to appear before the Board regarding the petition, pursuant to Board Rule 7-09.

50.    The Adams Campaign did not file a petition for reconsideration of the March 17th Nonpayment Determination.

51.    On April 2, 2025, the Adams Indictment was dismissed with prejudice.[13]

52.    On April 11, 2025, Jesse Schaffer, Director of Special Compliance for the Board, sent a letter to Vito Pitta, counsel to the Adams Campaign, requesting documents and information from the 2021 and 2025 Campaigns. A copy of this letter is attached as Exhibit 15 (the "April 11th Request"). Like the November 15th Request, the Board noted that staff was "reviewing the public funds eligibility of the Eric Adams 2025 Campaign" and said that the Board "has reason to believe that the [2021 Campaign and 2025 Campaign] committed violations of various federal statutes, Campaign Finance Act provisions, and/or Board Rules." In connection with the Board's consideration of the issue, the Board asked for documents/information relating to certain 2021 Campaign fundraiser events, the 2021 Campaign's office at the New World Mall, and contributions solicited by certain individuals.

---

[13] *United States v. Adams,* Case No. 24-CR-556 (DEH), Opinion & Order (S.D.N.Y. Apr. 2, 2025), ECF No. No. 117, is attached as Exhibit 23.

The original deadline for a response was May 2, 2025, but Mr. Pitta requested and was granted an extension to May 16, 2025.

53.     On April 14, 2025, the Board's staff provided a privileged and confidential memorandum to the Board analyzing the legal effect of the dismissal of the Indictment on the question of whether there was reason to believe that, in the course of Program participation, Mayor Adams engaged in conduct detrimental to the Program and in violation of law. In addition, the staff provided to the Board numerous publicly available documents related to the allegations in the Indictment and the dismissal, including:

a.  the Indictment;

b.  a federal criminal complaint alleging crimes committed by Mayor Adams's associate Mohamed Bahi in connection with an alleged straw donation scheme for Mayor Adams's 2021 mayoral campaign (a copy of the complaint is attached as Exhibit 16) (the "Bahi Complaint");

c.  a February 7, 2025 letter from former United States Attorney for the Southern District of New York Danielle Sassoon to Judges Dale E. Ho and Analisa Torres of the Southern District of New York, notifying them of Bahi's alleged intent to plead guilty to conspiracy to commit wire fraud (a copy of the letter is attached as Exhibit 17);

d.  a federal criminal information alleging that Mayor Adams's associate Erden Arkan committed wire fraud, in connection with an alleged straw donation scheme for Mayor Adams's 2021 mayoral campaign (a copy of the information is attached as Exhibit 18) (the "Arkan Information");

e.   the transcript of Arkan's allocution in which he pled guilty to that crime (a copy of the transcript of the plea hearing is attached as Exhibit 19) (the "Arkan Allocution");

f.   Acting Deputy Attorney General of the United States Department of Justice Emil Bove's February 10, 2025 memorandum to the United States Attorney's Office for the Southern District of New York, instructing prosecutors to dismiss the charges against Adams without prejudice (a copy of the memorandum is attached as Exhibit 20) ("February 10 Bove Memo");

g.   former United States Attorney for the Southern District of New York Danielle Sassoon's February 12, 2025 resignation letter (a copy of the letter is attached as Exhibit 21) ("February 12 Sassoon Resignation Letter");

h.   Mr. Bove's February 13, 2025 letter accepting Ms. Sassoon's resignation (a copy of the letter is attached as Exhibit 22); and

i.   Judge Ho's April 2, 2025 Opinion and Order dismissing the charges against Adams with prejudice (a copy of the Opinion and Order is attached as Exhibit 23) ("Judge Ho's April 2 Opinion").

54.   At 10:38 p.m. on April 14, 2025, Jesse Schaffer received a letter from Vito Pitta by email (the "April 14th Response") responding to the November 15th Request. A copy of the email and attached letter are attached as Exhibit 24. In the letter, Mr. Pitta stated that Eric Adams 2021 and Eric Adams 2025 (the "Committees") had reviewed their records and found no responsive documents that had not already been submitted to the Board. The letter stated that "additionally, in preparing this response to the request for documentation, Counsel to the Committees identified past and current employees, consultants, and agents of the Committees

20

who potentially could be in possession of documentation responsive to the CFB's request . . . These individuals all advised Counsel that they were in possession of no records which have not previously been provided to the [Board] by the Committees." The letter did not say whether or not Mayor Adams himself had reviewed his records for responsive documents.

55.     On the morning of April 15, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the Board staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) there was reason to believe that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law, including the Campaign Finance Act and Board Rules; (2) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board by the deadline set by the Board; (3) the Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB; and (4) the difference between the Adams Campaign's reported receipts and documented receipts was equal to or greater than 10%. Board staff also informed the Board that the Adams Campaign had submitted a response to the November 15th Request the night before, months after the deadline set by the Board.

56.     At around 10:00 a.m., later that same day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

57.     Also on April 15, 2025, Board staff issued an Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 25 (the "First April 15th Nonpayment Determination"). Later that day, the staff issued a revised Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is

attached as Exhibit 26 (the "Second April 15th Nonpayment Determination"). On the same day, the staff also issued a Supplemental Notice regarding the nonpayment determination (the "April 15th Notice"). A copy of the April 15th Notice is attached as Exhibit 27.

58.     The Second April 15th Nonpayment Determination and the April 15th Notice explained that the Adams Campaign was not eligible for payment for three reasons[14]:

    a.  The Adams Campaign had not demonstrated compliance with Admin. Code § 12-110, as determined by the COIB. *See* Admin. Code. § 3-703(1)(m);

    b.  The Adams Campaign had failed to respond to the November 15th Request by the December 6, 2024 deadline set by the Board and in time for the Board to review the response prior to its April 15th meeting; and

    c.  The Board had reason to believe that Mayor Adams had, in the course of public funds program participation, engaged in conduct detrimental to the Program that is in violation of federal, state, and/or city law, including the Act and the Board Rules.

59.     The April 15th Notice noted that the Board had reviewed all of the documents listed above, *supra* ¶ 53, related to the allegations in the Indictment and its dismissal.

60.     On April 21, 2025, a Board staff member emailed New York City COIB staff to ask for a list of incumbent candidates who had submitted their 2024 annual COIB disclosure reports. That same day, COIB staff responded and attached a list of incumbent candidates who had filed their reports. The list showed that Mayor Adams had submitted an initial filing on April

---

[14] As noted *supra* footnote 7, the Second April 15th Nonpayment Determination mistakenly cited one incorrect reason for nonpayment and omitted two of the correct reasons for nonpayment. These errors were subsequently corrected in response to the Adams Campaign's 7-09 Petition, *see infra* ¶¶ 69-70.

14, 2025 but that it had not been accepted by the COIB because it was not in compliance with Section 12-110 of the Admin. Code, and therefore was not completed. A copy of the April 21, 2025 email chain and attachment are attached as Exhibit 28.

61.     On April 25, 2025 at 12:25 p.m., COIB staff sent Board staff an updated list of incumbent candidates who had submitted their 2024 annual COIB disclosure reports. A copy of the email and list are attached as Exhibit 29. The list again showed that Mayor Adams's filing had not been accepted by COIB and was not complete.

62.     At 4:39 p.m. on that same day, COIB staff sent Board staff an update that Mayor Adams had filed an amendment to his disclosure and COIB had then accepted the disclosure filing as complete. A copy of this email is attached as Exhibit 30.

63.     At 7:32 p.m. on April 25, 2025, the Adams Campaign filed a petition for reconsideration of the Board's April 15, 2025 Nonpayment Determination, pursuant to Board Rule 7-09 (the "7-09 Petition"). A copy of the 7-09 Petition and transmission email are attached as Exhibit 31.

64.     The 7-09 Petition noted that Mayor Adams "waive[d] his right to appear before the Board in connection with [the] petition."

65.     Board Rule 7-09(c) provides that if a petition is in substantial compliance with the requirements of Board Rule 7-09, the Board will act on the petition within five business days. Board Rule 7-09(c)(i) further provides that where a candidate waives the right to appear before the Board, "[i]f the Board is unable to convene within five business days of receipt of the petition . . . then the Board may delegate to the Chair of the Board or the Chair's designee authority to make a determination regarding the petition."

66.     The Board was unable to convene within five business days of receipt of the petition and therefore delegated to the Chair of the Board, Frederick Schaffer, the authority to make a determination regarding the petition, pursuant to Board Rule 7-09(c)(i).

67.     On May 2, 2025, Board staff provided Chair Schaffer with a privileged and confidential legal memorandum analyzing the merits of the arguments presented in the 7-09 Petition. The memorandum attached the Second April 15[th] Nonpayment Determination, the April 15[th] Notice, the 7-09 Petition, and another privileged and confidential legal memorandum from the Board staff analyzing the standards for reviewing a Rule 7-09 petition.

68.     On May 2, 2025, Chair Schaffer, using the authority given to him by the Board Rules, denied the Adams Campaign's 7-09 Petition.

69.     On that same day, Joseph Gallagher, the Board's General Counsel, emailed Mr. Pitta notifying him of Chair Schaffer's determination and responding to arguments in the 7-09 Petition. A copy of Mr. Gallagher's May 2, 2025 email to Mr. Pitta is attached as Exhibit 32.

70.     Mr. Gallagher also attached to his email a corrected April 15[th] Nonpayment Determination (the "Corrected April 15[th] Nonpayment Determination") and an amended April 15[th] Notice (the "Amended April 15[th] Notice"). Copies of these documents are attached as Exhibits 33 and 34, respectively. The Corrected April 15[th] Nonpayment Determination corrected the mistakes referenced *supra* footnote 7, that were in the Second April 15[th] Nonpayment Determination and the Amended April 15[th] Notice provided additional detail on the violations of law which the Board had reason to believe had occurred.

71.     In his May 2[nd] email, Mr. Gallagher explained, *inter alia*, that:

    a.  The disclosure that Mayor Adams filed with the COIB on April 14, 2025 was incomplete and the Board understood that Mayor Adams only completed his

disclosure on April 25, 2025. Further, Board Rule 3-05(b) requires candidates to "demonstrate" compliance with the COIB requirement at least "3 days prior to the next payment date."

b. The deadline set by the Board for a response to the November 15th Request was December 6, 2024. The Adams Campaign submitted a response 130 days after the initial due date and less than 12 hours before the payment determination was to be made.

c. Pursuant to the Adams Campaign's request, the Board was providing the Amended April 15th Notice to give additional detail on the violations of law at issue.

72. In his May 2nd email, Mr. Gallagher also invited the Adams Campaign "to provide any and all documentation and/or explanations to demonstrate to the Board that there is no reason to believe that the Candidate, in the course of public funds program participation, engaged in conduct detrimental to the public funds program that is in violation of Federal, State, and/or City Law, including the Campaign Finance Act and Board Rules." *See* Ex. 32.

73. On May 5, 2025, the Board staff provided the Board with a privileged and confidential legal memorandum analyzing the merits of the arguments presented in the 7-09 Petition. The memorandum attached the Second April 15th Nonpayment Determination, the April 15th Notice, the 7-09 Petition, and another privileged and confidential legal memorandum from the Board staff analyzing the standards for reviewing a 7-09 petition.

74. At a meeting on May 12, 2025, the Board voted to ratify Chair Schaffer's denial of the 7-09 Petition.

75.     On May 13, 2025, Mr. Gallagher sent the Adams Campaign a letter notifying them of the Board's May 12th determination. A copy of the letter is attached as Exhibit 35.

76.     On May 16, 2025, Mr. Pitta sent a letter (the "May 16th Response") to Mr. Schaffer responding to the April 11th Request for documents and information. A copy of the letter is attached as Exhibit 36. In the letter, Mr. Pitta stated that the Committees had reviewed their records and found no responsive documents that had not already been submitted to the Board. The letter stated that "additionally, in preparing this response to the request for documentation, Counsel to the Committees identified past and current employees, consultants, and agents of the Committees who potentially could be in possession of documentation responsive to the CFB's request . . . These individuals all advised Counsel that they were in possession of no records which have not previously been provided to the [Board] by the Committees." The letter did not say whether or not Mayor Adams himself had reviewed his records for responsive documents.

**Plaintiffs' First Lawsuit: *Adams I***

77.     On May 27, 2025, Plaintiffs filed an action in Kings County Supreme Court challenging four of the Board's nonpayment determinations (December 2024, January 2025, March 2025, and April 2025). *See Eric Adams 2025 v. New York City Campaign Fin. Bd.,* Index No. 517421/2025 (Sup. Ct. Kings Cnty 2025). On June 16, 2025, the Board removed the action to federal court. *See id.* ECF No. 35.

78.     On July 11, 2025, this Court upheld the Board's four nonpayment decisions based on Mayor Adams's failure to timely file his COIB disclosure and the Adams Campaign's failure to timely respond to the November 15th Request. The Court granted the Board's motion for judgment on the pleadings, denied Plaintiffs' demand for relief pursuant to CPLR Article 78, and

dismissed Plaintiffs' declaratory judgment claims, request for money damages, and attorneys' fees and litigation expenses. *See Eric Adams 2025 v. New York City Campaign Fin. Bd.*, No. 25-CV-3380 (NGG) (LKE), 2025 WL 1920885, at *27 (E.D.N.Y. July 11, 2025).

79.    On July 14, 2025, judgment was entered in favor of the Board and the case was closed.

**The Board's June 16th Request for Documents and Information**

80.    On June 16, 2025, the Board staff sent a letter to counsel to the Adams Campaign, Vito Pitta, requesting additional documents and information from the 2021 and 2025 Campaigns. A copy of this letter is attached as Exhibit 37 (the "June 16th Request"). In this letter, the Board staff explained that the April 14th Response to the November 15th Request, and the May 16th Response to the April 11th Request, were deficient because the Adams Campaign had not indicated that Mayor Adams was contacted and asked for relevant documentation responsive to the requests. The Board staff accordingly restated those requests for documents in full and advised the Adams Campaign that it must provide responsive documents from Mayor Adams. The Board staff also asked for a list of the current and past employees, consultants and agents that were contacted by the Adams Campaign in connection with the November 15th Request and April 11th Request. In addition, the Board noted that it had reviewed documents relating to *United States v. Eric Adams*, No. 24-cr-556 (S.D.N.Y.) released by the Department of Justice on May 9, 2025 (collectively, the "DOJ Documents"),[15] and was making additional new requests

---

[15] On April 25, 2025, Judge Ho granted a motion by the New York Times Company and NYP Holdings, Inc. seeking the public filing of the following materials from the U.S. Attorney's Office of the Southern District of New York's investigation and discovery process in *United States v. Eric Adams*, No. 24-cr-556 (DEH): (1) search warrants and accompanying affidavits identifying and describing evidence; (2) indexes compiled by the government that accompanied discovery productions to defense counsel; (3) a December 2021 application for a 2703(d) Order; and (4) an August 2024 application for a warrant for location data for Mayor Adams's cell

based on that review. While a handful of the requests in the June 16th Request were new, the vast majority were simply restating items contained in the November 15th Request and April 11th Request or providing further specificity regarding those requests based on review of the DOJ Documents.[16] The letter required a response by July 11, 2025.

81.    On July 2, 2025, Mr. Pitta sent a letter and a revised letter several hours later to the Board (both dated July 1, 2025) requesting that the Board withdraw the June 16th Request. A copy of the email and attached initial letter is attached as Exhibit 38. A copy of the email and attached revised letter is attached as Exhibit 39.

82.    On July 3, 2025, Board staff sent a letter to the 2021 and 2025 Campaigns (the "July 3rd Letter"), which: 1) explained that the Board would not withdraw its June 16th Request, as the Board has a duty to ensure the proper administration of the matching funds program, including the lawful obtainment and use of taxpayer-funded matching funds by candidates for public office and their committees; 2) asked Mr. Pitta to confirm that he represents Mayor Adams; and 3) asked Mr. Pitta to confirm that his April 14th Response, May 16th Response, and July 2, 2025 letter were submitted on behalf of Mayor Adams, as a member of the 2025 Campaign. A copy of the July 3rd Letter is attached as Exhibit 40.

---

phone. *See* Memorandum Order, *United States v. Adams*, No. 24-cr-556 (DEH) (S.D.N.Y. Apr. 25, 2025), ECF No. 185. On May 9, 2025, the government filed these items on the public docket. *See* Letter by U.S.A. as to Eric Adams, *United States v. Adams*, No. 24-cr-556 (DEH) (S.D.N.Y. May 9, 2025), ECF No. 191.

[16] For example, the November 15th Request called for all campaign communications relating to an alleged June 22, 2018 fundraiser referenced in ¶ 19 of the Indictment, "including but not limited to those from the Turkish Official (Reyhan Özgür), the Airline Manager (Cenk Öcal) and/or the Adams Staffer (Rana Abbasova)." *See* Ex. 5. In the June 16th Request, Board staff specifically stated that this would include "[c]ommunications between Eric Adams and Rana Abbasova on or about June 22, 2018 in which Eric Adams directed and/or encouraged Abbasova, either directly or implied, to pursue the contribution scheme with the Promoter (Arda Sayiner)." *See* Ex 37.

83.    At 9:45 p.m. on July 11, 2025 (the deadline for the response to the June 16[th] Request), Mr. Pitta responded with a list of past and current employees, consultants, and agents of the Committees that had been asked to provide responsive documentation in response to the November 15[th] Request and the April 11[th] Request (the "July 11[th] Response"). The list named 12 individuals, including Mayor Adams, Brianna Suggs, Vito Pitta, Gladys Miranda, and Katie Moore, among others. The July 11[th] Response also requested an extension of the response deadline for the June 16[th] Request to August 1, 2025. A copy of the July 11[th] Response is attached as Exhibit 41.

84.    On July 14, 2025, Board staff sent a letter to the 2021 and 2025 Campaigns granting the request for an extension but 1) informing Mr. Pitta that the 2025 Campaign's failure to provide requested documentation could result in the Board finding the 2025 Campaign ineligible for public funds at the July 15, 2025 Board meeting, and 2) requesting that the 2025 Campaign clarify certain inconsistencies in representations made to the Board by the 2025 Campaign (the "July 14[th] Letter"). A copy of the July 14[th] Letter is attached as Exhibit 42.

85.    In the July 14[th] Letter, Board staff specifically raised three concerns:

a.    On July 10, 2025, during the litigation before this Court (*Adams I*), counsel for Mayor Adams stated that Mayor Adams had not been asked by the Board to provide any responsive records. *See* Let., *Eric Adams 2025 et al. v. New York City Campaign Finance Board,* No. 25-CV-3380 (NGG) (LKE) (E.D.N.Y. July 10, 2025), ECF No. 16 ("[T]he CFB made its request to the 2021 and 2025 Adams Campaigns, not Mayor Adams."). This statement conflicted directly with the Campaigns' assertion in their July 11[th] Response that Mayor Adams was among the individuals contacted by Counsel to obtain responsive documents. Board staff

29

asked for an explanation of these inconsistent statements and for the Adams Campaign to state when Mayor Adams had been asked to provide responsive documents, when he completed his search, and to confirm that his search for responsive documents included documents provided to him by the government as part of discovery in *United States v. Adams*, No. 24-CR-556 (DEH) (S.D.N.Y.).

b. The Campaigns' refusal to respond to the November 15th Request was based on advice of criminal counsel, given that the requests related specifically to events that were referenced in the Indictment, but following the dismissal of the Indictment, the Campaigns claimed that no responsive documents existed. Board staff asked why the Campaigns had initially refused to respond to the November 15th Request if no responsive documents existed.

c. The list of individuals identified in the July 11th Response did not appear to be a complete or sufficient accounting of all agents, consultants, or others who may have had relevant knowledge or access to records concerning the Campaigns' activities. Board staff asked for a more comprehensive identification of such individuals, including but not limited to Winnie Greco, Mohamed Bahi, Ahsan Chughtai, and Rana Abbasova.

**The Board's July 15, 2025 Nonpayment Determination**

86.    On the morning of July 15, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board.

87.    Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

88.    On July 15, 2025, Board staff issued an Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 43 (the "July 15[th] Nonpayment Determination").[17] On the same day, staff also issued a Supplemental Notice regarding the nonpayment determination (the "July 15[th] Notice"). A copy of the July 15[th] Notice is attached as Exhibit 44.

89.    The July 15[th] Notice explained that the Adams Campaign was not eligible for payment because it failed to provide to the Board, upon its request, documents, records, or other information that verified campaign activity.

90.    As reflected in a Board press release issued that same day, Board Chair Frederick Schaffer stated at the public meeting:

> In May, Mayor Adams sued the Board, challenging the grounds on which the Board had deemed his campaign ineligible for public funds. On July 11, the court ruled in favor of the Board and dismissed Mayor Adams' lawsuit, concluding the Board had two valid reasons to deny payment: (1) Mayor Adams' failure to timely respond to the Board's request for information and (2) his failure to timely file COIB disclosure. However, the court called into question the Board's reliance on the indictment of Mayor Adams as a basis for its reason to believe the Adams campaign violated the law, and stressed the importance of independent fact finding by the Board.
>
> The Board's investigation of the Adams campaign is ongoing, including into whether there is reason to believe the campaign violated the law. On July 11, the campaign asked to extend to August 1 its deadline to respond to a Board request for documents and information as part of the Board's investigation. Because the documents and information requested from the Adams campaign are still outstanding, the Board determined today that Mayor Adams' campaign has failed to demonstrate eligibility for public funds payment at this time. Our priority remains achieving an equitable and transparent democracy that is accountable to all New Yorkers.

---

[17] The July 15[th] Nonpayment Determination mistakenly did not include the correct reasons for the nonpayment determination for the same reason mentioned *supra* footnote 7. The Early Public Funds Nonpayment Determination should have cited Board Rule 3-01(D)(i)(A)(2) and Admin Code § 3-703(1)(d).

A copy of this press release is attached as Exhibit 45.

91.     The Adams Campaign did not file a petition for reconsideration of the July 15th Nonpayment Determination.

**The Adams Campaign's Response to the June 16th Request and July 14th Letter, and the Campaign's July 11 Funds Variance**

92.     On July 25, 2025, the Committees submitted a preliminary response to the June 16th Request and the July 14th Letter (the "July 25th Response"). A copy of the July 25th Response is attached as Exhibit 46.

93.     On August 1, 2025, Mr. Pitta sent an email to Board staff informing them that the Committees would be supplementing their July 25th Response, and asking whether Board staff had "received the initial submission and no additional information is being requested other than what has been identified in the document request." That same day, Board staff sent an email to Mr. Pitta explaining that they would review the supplemental response after submission and would then notify the Campaign if additional documentation or information was being requested. Later that day, the Committees submitted a supplemental response to the June 16th Request and the July 14th Letter (the "August 1st Response"). A copy of the August 1, 2025 email chain and the August 1st document production response is attached as Exhibit 47.[18]

94.     Additionally, on July 15, 2025 (the relevant deadline for the August 6th payment date), the Campaign submitted its eleventh disclosure statement, which reported contribution activity between June 10 and July 11, 2025. The disclosure statement revealed that the Campaign had a high variance, 15.44%, of receipts between reported and documented contributions, in violation of Board Rule 3-01(d)(i)(A)(3). As mentioned *supra* Paragraph 13(b), the Board has set

---

[18] We have redacted certain personally identifying information from Exhibits 46 and 47.

10% as the maximum permissible campaign variance. This variance occurred because of a delayed funds transfer from the Adams Campaign's Contribute/Stripe account to the Campaign's bank account: the campaign reported contributions, but Stripe had not transferred those contributions to the Adams Campaign's bank account. On July 17, Stripe sent $2,139,288.26 of contributions made between January 8 and July 11, 2025 to the Campaign's bank account, resolving the variance. The Adams Campaign then notified the Board that it had come into compliance with Board Rule 3-01(d)(i)(A)(3). The Board accepted the Adams Campaign's late compliance because the Adams Campaign provided the Board with updated information from Stripe with sufficient time before the Board's August 6, 2025 payment date.[19]

**CFB's Independent Investigation**

95.    In addition to the above-described steps that the Board has taken in requesting information from the Adams Campaign, the Board has also issued numerous subpoenas to third parties, consistent with its investigative authority.[20] *See supra* Paragraph 18. Specifically, as of today's date, the Board has issued subpoenas for documents and testimony to 17 individuals and has begun to receive documents and take depositions. These subpoenas were issued between June 13, 2025 and July 31, 2025.

_____

[19] Typically, to be in compliance with disclosure statement obligations and thus be eligible for matching funds payment, campaigns must resolve variances during the disclosure period. If a variance exists at the end of a disclosure period, a campaign may fix the variance prior to the deadline for filing the next disclosure statement to receive payment on the following payment date.

[20] Consistent with the Board's regular practice, between the time that the Board became aware of the federal investigation of the Adams Campaign in 2021 and the time that the government moved to dismiss the Indictment, the Board did not submit inquiries for information to individuals or entities aside from the 2025 Campaign. The Board follows this practice to avoid interfering in government investigations.

96.    In addition to drafting and sending additional documentation requests to the Adams Campaign and third parties, *see supra* ¶ 95, Board staff has (1) undertaken independent research to identify individuals named in the Indictment; (2) undertaken independent research to identify and evaluate contributions to the Adams Campaigns discussed in the Indictment, as well as any potentially related contributions; (3) undertaken independent research to identify and evaluate contributions discussed in investigative news stories as potential straw donations, as well as any potentially related contributions; (4) conducted a comprehensive evaluation of existing publicly available evidence and allegations (including indictments, complaints, informations, and statements made by law enforcement such as former U.S. Attorney for the Southern District of New York Danielle Sassoon and NYC Department of Investigations Commissioner Jocelyn Strauber); (5) undertaken comprehensive research and evaluation of laws potentially implicated by the alleged conduct of Mayor Adams and the Adams campaigns; (6) submitted a request to Judge Ho of the Southern District of New York to unseal FBI agent affidavits and search warrant applications related to the S.D.N.Y. case *United States v. Adams*," *see supra* ¶ 80; (7) undertaken a comprehensive examination of the approximately 50 files provided by the Department of Justice in response to this request; (8) undertaken independent research to identify individuals discussed in these documents; (9) undertaken independent research to identify and evaluate contributions to the Adams Campaigns discussed in these documents; (10) initiated outreach to the NYC Department of Investigations to discuss access to materials related to the Department of Investigations' inquiry into related matters; (11) conducted a review of the 2025 Campaign's 2025 disclosure statements and engaged in corresponding outreach to contributors; and (12) conducted outreach and research in an attempt

to obtain Mayor Adams' COIB disclosure reports for years that are not currently publicly available.

97.     On July 25, 2025, Board staff sent a request under the federal Freedom of Information Act to the Department of Justice and a request under the state Freedom of Information Law to New York City's Department of Investigation for records related to *United States v. Adams*, No. 24-cr-556 (DEH) (S.D.N.Y.) and related investigations.

98.     In late July 2025, Board staff retained the assistance of an outside investigator, DeLuca Advisory Services, to conduct witness interviews with individuals who may have acted as straw donors and provide recommendations regarding the Board staff's independent investigation and its conclusions.

99.     The Board's investigation remains ongoing, and I expect that the Board will continue to issue additional subpoenas as it proceeds.

**The Board's August 6, 2025 Nonpayment Determination**

100.     On August 5, 2025, Board staff submitted to the Board a privileged and confidential legal memorandum: (1) summarizing the procedural history of the Board's determinations of public funding eligibility for the Adams Campaign; (2) detailing the Board's independent investigation into the Adams Campaign's public funding eligibility and its findings; (3) detailing bases to withhold matching funds due to the Adams Campaign's failure to provide information to the Board upon request under Board Rule 3-01(d)(i)(A)(2) and Admin. Code § 3-703(1)(d); (4) analyzing this Court's opinion in *Adams I* and its effect on the Board's deliberations; and (5) detailing specific bases for withholding matching funds under Board Rule 3-01(d)(ii)(B), including the evidence supporting a finding of "reason to believe" under the

Board Rule for each violation of law implicated and how each such alleged violation is detrimental to the Public Funds Program.

101.    The August 5th memorandum to the Board attached the following documents for the Board's consideration:

a.    The Indictment. *See* Ex. 4.

b.    The Bahi Complaint. *See* Ex. 16.

c.    The Arkan Information. *See* Ex. 18.

d.    The Arkan Allocution. *See* Ex. 19.

e.    The Indictment against Dwayne Montgomery, Shamsuddin Riza, Millicent Redick, Ronald Peek, Yahya Mushtaq, Shahid Mushtaq, and EcoSafety Consultants Inc. Indictment, *People v. Montgomery et al.,* No. 72232-2023 (N.Y. Sup. Ct. N.Y. Co. 2023). A copy of the Indictment is attached as Ex. 48.

f.    The February 10 Bove Memo. *See* Ex. 20.

g.    The February 12 Sassoon Resignation Letter. *See* Ex. 21.

h.    The February 13, 2025 Bove Letter. *See* Ex. 22.

i.    The government's motion to dismiss the Indictment without prejudice. Nolle Prosequi, *United States v. Adams*, No. 24-cr-556 (DEH) (S.D.N.Y. Feb. 14, 2025), ECF No. 122. A copy of the Nolle Prosequi is attached as Exhibit 49.

j.    Judge Ho's April 2 Opinion. *See* Ex. 23.

k.    Selected FBI agent affidavits from the Department of Justice Documents that were posted to the docket in *United States v. Adams*, No. 24-cr-556 (DEH) (S.D.N.Y.). A copy of these affidavits is attached as Exhibit 50.

l.  Documents produced by Erden Arkan in response to a CFB subpoena. I have not attached Mr. Arkan's production because it is important that these materials be kept confidential while the Board's investigation is ongoing.

m.  The November 15th Request. *See* Ex. 5.

n.  The April 11th Request. *See* Ex. 15.

o.  The April 14th Response. *See* Ex. 24.

p.  The May 16th Response. *See* Ex. 36.

q.  The June 16th Request. *See* Ex. 37.

r.  The first letter dated July 1, 2025 sent to the Board by Vito Pitta on July 2, 2025. *See* Ex. 38.

s.  The second letter dated July 1, 2025 sent to the Board by Mr. Pitta on July 2, 2025. *See* Ex. 39.

t.  The July 3rd Letter. *See* Ex. 40.

u.  The July 11th Response. *See* Exhibit 41.

v.  The July 14th Letter. *See* Exhibit 42.

w.  The July 25th Response. *See* Exhibit 46.

x.  A portion of the August 1, 2025 email chain between Vito Pitta and Board staff referred to *supra* Paragraph 93. *See* Ex. 47.

y.  The August 1st Response. *See* Ex. 47.

z.  The Amended April 15th Notice. *See* Ex. 26.

aa. The 7-09 Petition. *See* Ex. 31.

bb. A July 29, 2025 letter from CFB General Counsel, Joseph Gallagher, to Assistant U.S. Attorneys for the Southern District of New York Robert Sobelman and Lara

Pomerantz requesting that, under the protective order in *United States v. Adams*, No. 24-cr-556 (DEH) (S.D.N.Y), the government authorize the Adams Campaign to disclose materials that the Board had requested. A copy of this letter is attached as Exhibit 51.

cc. A list of responsive, known communications omitted from the Campaigns' response to the Board's June 16th Request. A copy of this list is attached as Exhibit 52.

dd. Mayor Adams's 2019 COIB Disclosure Statement. A copy of this disclosure statement is attached as Exhibit 53.

ee. Mayor Adams's 2021 COIB Disclosure Statement. A copy of this disclosure statement is attached as Exhibit 54.

102.    On the morning of August 6, 2025, I attended a meeting in which the Board staff briefed the Board on the staff's public funds payment recommendation with respect to the Adams Campaign. At that meeting, the staff recommended that the Board determine the Adams Campaign to be ineligible for payment because: (1) the Adams Campaign had failed to provide to the Board, upon its request and by the deadline set forth by the Board, documents and information verifying campaign activity; and (2) there was reason to believe that the Candidate had, in the course of Program participation, engaged in conduct detrimental to the Program and in violation of law.

103.    Later that day, the Board held a public meeting in which they voted to deny public funds to the Adams Campaign.

104.    As reflected in a Board press release issued on the same day as the nonpayment determination, Board Chair Schaffer stated at the public meeting: "The Board determined Mayor

Adams' campaign has failed to demonstrate eligibility for public funds payment at this time on two grounds: one, failure to provide requested information, and two, reason to believe the campaign violated the law . . . With respect to the failure to provide requested information, the Board finds the campaign has provided incomplete and misleading information to the CFB and has impeded the CFB staff's ability to complete its investigation. With respect to the second ground, the Board's conclusion is based upon its review of all of the available evidence, including but not limited to its own independent investigation. The Board's investigation of the Adams campaign is ongoing. As stewards of taxpayer dollars, we are committed to enforcing the rules fairly and equally to all candidates." A copy of the press release is attached as Exhibit 55.

105.    On August 6, 2025, Board staff issued an Early Public Funds Nonpayment Determination to the Adams Campaign. A copy of that document is attached as Exhibit 56 (the "August 6th Nonpayment Determination").

106.    On August 7, 2025, Board staff issued a Supplemental Notice regarding the August 6th Nonpayment Determination (the "August 7th Notice"). A copy of the August 7th Notice is attached as Exhibit 57. Board staff also issued a revised Early Public Funds Nonpayment Determination to the Adams Campaign with a blackline highlighting corrections made to the earlier document. A copy of the blackline and clean revised nonpayment determination is attached as Exhibit 58 (the "Revised August 6th Nonpayment Determination").

107.    The Revised August 6th Nonpayment Determination and the August 7th Notice collectively explained that the Adams Campaign was not eligible for two reasons: (1) the Adams Campaign had failed to provide documents and information verifying campaign activity that had been requested by the Board by the deadline set by the Board; and (2) there was reason to believe

that Mayor Adams, in the course of Program participation, had engaged in conduct detrimental to the Program and in violation of law.

108.    On the first reason for nonpayment, the August 7[th] Notice, *see* Ex. 57, explained that the July 25[th] Response and the August 1[st] Response revealed the following omissions, inconsistencies, and misrepresentations in the Campaigns' responses to the Board's requests for information and documentation to date:

    a.    "For the first time, and only in response to CFB staff's direct question, the Campaign's counsel stated that Mayor Adams is in fact in possession of discovery provided by the U.S. Attorney's Office for the Southern District of New York in *United States v. Adams*, No. 24-CR-556 (S.D.N.Y.), but that he cannot provide the CFB with those records because they are subject to a protective order. The Committees' prior statements that they were not in possession of any records responsive to the November 15[th] Request and the April 11[th] Request that had not previously been submitted to the CFB, were knowingly false. The Campaign should have notified the CFB that it was in possession of responsive documents, even if the documents could not be provided at that time. The Protective Order provides that '[t]he Government may authorize, in writing, disclosure of Disclosure Material beyond that otherwise permitted by this Order without further Order of this Court.' The Campaigns should have advised the CFB of the Protective Order earlier — at least as part of the April 14[th] Response to the November 15[th] Request, so that the CFB itself could have requested authorization from the Government, or made a motion before Judge Ho for access to the responsive material months ago. The Campaigns' failure to provide this material information has delayed the CFB's investigation by several months. The Campaign has not demonstrated good cause for 1) its failure to disclose the potentially responsive documents covered by the Protective Order and 2) failure to request authorization to disclose the relevant information to the Board prior to the submission of its April 14[th] Response to the November 15[th] Request."[21]

    b.    "As part of the July 25[th] Response and August 1[st] Response, the Campaign produced documents responsive to the November 15[th] Request and the April 11[th] Request from what appear to be, inter alia, the following custodians: Mayor Adams, Brianna Suggs, and Vito Pitta. Counsel to the Campaign previously represented that these custodians had been asked to search for and provide any

---

[21] On August 1, 2025, Board staff directed the Adams Campaign to request that the government authorize them, under the Protective Order, to produce the materials that the Board had requested. *See* Ex. 47. On August 5, 2025, Mr. Pitta informed Board staff that he submitted the request and later provided a copy of it at the staff's request. A copy of the August 5, 2025 email chain and attached request to the Southern District of New York is attached as Exhibit 59.

responsive documents and that there were no responsive documents that had not already been provided to the CFB. This representation was apparently false. The April 14[th] Response to the November 15[th] Request and the May 16[th] Response to the April 11[th] Request were incomplete and the Campaign has offered no justification for why the records recently submitted were not previously provided."

c.   "In the July 25[th] Response, the Committees provided a list of 31 individuals that have now been contacted for responsive documents. In the July 11[th] Response, the Committees indicated that 12 individuals had been contacted. The Committees have provided no justification for why these additional 19 individuals, some of whom were named specifically in the November 15[th] and April 11[th] Requests (*e.g.*, Rana Abbasova) were not previously contacted."

d.   "In the August 1[st] Response, Counsel stated that some of the individuals identified on July 25, 2025 as having been contacted to obtain responsive documents had provided documents, others had indicated that they had no responsive documents, others had not responded, and one had declined to provide materials on advice of counsel. The Campaigns' response to the CFB's requests is therefore incomplete. Absent information on which custodian invoked their Fifth Amendment rights, stated that they lack responsive documents, and failed to respond, the CFB cannot conduct a complete independent investigation. Information on who has invoked their Fifth Amendment rights or otherwise did not reply is crucial to the CFB's issuance of subpoenas ad testificandum."

e.   "The August 1[st] Response contains a screenshot of a text message regarding the September 20, 2023 fundraising event referenced in the November 15[th] Request. That request sought 'all campaign communications relating to the event, including but not limited to those to or from Arda Sayiner.' The text message is from 'Arda Turkey,' and one message on the screenshot reads 'Hello Eric. If you are interested in these people I will invite them to NYC to meet you before or after the dinner I'm organizing for you in September.' The screenshot appears to be an incomplete depiction of a larger text conversation and thus indicates that not all responsive documents have been produced to the CFB. Indeed, one of the text messages in the screenshot is truncated. The Campaign's response is therefore incomplete."

f.   "In response to the CFB's question regarding the Campaigns' inconsistent statements about whether or not Mayor Adams was asked to or needed to search for responsive documents, Counsel stated that he 'understood the request for information to be requests for documents in possession of the Committees, not any specific individuals associated with the Committees' including Mayor Adams. Yet Counsel simultaneously stated that the Committees did not respond to the November 15[th] Request because Mayor Adams had invoked his Fifth Amendment rights. This statement proves that the Committees did understand the Request to include Mayor Adams. It makes no sense to say Mayor Adams was

invoking his rights if he was not being asked to produce material. And the Committees have not provided any explanation as to why the other individuals that have now been contacted and asked to produce documents could not have previously been contacted and asked to produce documents."

g.  "CFB staff has reviewed the July 25[th] Response and the August 1[st] Response and found that the 2025 Campaign failed to provide certain relevant and requested communications known by CFB staff to have occurred." The Board attached to the August 7th Notice the list of responsive, known communications that were not included in the Campaigns' response to the Board's June 16th Request. *See* Ex. 57 at 14-15; Ex. 52.

109.    The Board noted that while each issue listed in Paragraph 108 independently "shows that the Campaign has failed to comply with Rule 3-01(d)(i)(A)(2) and New York City Administrative Code § 3-703(1)(d), collectively they reflect a pattern of incomplete and misleading responses that has delayed the staff's investigation." The Board stated that there was no basis "to excuse the Campaign's non-compliance."

110.    With respect to the second reason for nonpayment (reason to believe that in the course of Program participation, the candidate engaged in conduct detrimental to the Program in violation of any other applicable law), the August 7th Notice described the materials reviewed by the Board as part of its independent investigation, the laws believed to have been violated by Mayor Adams,[22] and the general facts believed to form the basis of the violations.

---

[22] The Board determined that it has reason to believe that Mayor Adams:
1.  Committed wire fraud, in violation of 18 U.S.C. § 1343;
2.  Solicited, accepted, and/or received a contribution by a foreign national, in violation of 52 U.S.C. § 30121 as well as Board Rule § 5-03(d);
3.  Obstructed justice and engaged in a conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(b) and 1512(c)(1), and 18 U.S.C. § 371;
4.  Engaged in bribery, in violation of 18 U.S.C. § 666(a)(1)(B);
5.  Engaged in a conspiracy to commit wire fraud, commit bribery, and receive contributions from a foreign national, in violation of 18 U.S.C. § 371;
6.  Failed to accurately disclose campaign transactions and the true identity of contributors, in violation of NYS Election Law §§ 14–102(1), 14-104(1), 14-108, and 14–120 and NYS Board of Elections Rules §§ 6200.1(a)(2) and 6200.2;

111.    Both the August 7th Notice and the Revised August 6th Nonpayment Determination advised the Adams Campaign of its right to petition the Board for reconsideration under Board Rule 7-09. They further stated that "[i]n connection with any such petition, the Board encourages you to present any additional documents, affidavits, or arguments that support your campaign's eligibility to receive public funds." The Revised August 6th Nonpayment Determination also stated, pursuant to Admin. Code §§ 3-710 and Board Rule 3-01(c), "[t]his nonpayment of public funds is not a final determination by the Board, but rather is a preliminary determination subject to review of ongoing financial activity and final audit."

112.    The Adams Campaign did not file a Board Rule 7-09 petition for reconsideration of the August 6, 2025 Nonpayment Determination.

113.    On August 28, 2025, the next of the Board's scheduled payment dates, the Board determined that the Adams Campaign did not demonstrate eligibility for a public funds payment.

---

7.    Accepted contributions from corporations doing business in New York State, in violation of NYS Election Law §§ 14-116(1);

8.    Engaged in a conspiracy to promote his election through unlawful means, in violation of NYS Election Law § 17-152;

9.    Defrauded the government, in violation of NYS Penal Law § 195.20;

10.    Received bribes, in violation of NYS Penal Law §§ 200.10 and 200.12;

11.    Failed to accurately disclose contributor and intermediary information to the Board, in violation of NYC Admin. Code §§ 3-703(1)(d)(i)-(iv), 3-703(1)(g), and 3-703(6) and Board Rules §§ 3-01(e)(i)(A)–(C), 3-01(e)(ii), 4-01(b)(ii), 4-04, and 4-05(c)(ii);

12.    Accepted contributions in excess of the applicable limit, in violation of NYC Admin. Code § 3-703(1)(f) and Board Rule § 5-01(a);

13.    Accepted corporate contributions, in violation of NYC Admin. Code § 3-703(1)(l) and Board Rule § 5-03(a);

14.    Engaged in financial transactions in conflict with the proper discharge of his duties as a public official, in violation of NYC Charter § 2604(b)(2);

15.    Failed to disclose gifts to the NYC Conflicts of Interest Board, in violation of NYC Admin. Code §§ 12-110(b)–(d) and 12-110(d)(1)(h)(4) and Board Rule § 3-01(d)(ii)(A)(4);

16.    Received prohibited gifts and used his position to obtain personal financial gain, in violation of NYC Charter §§ 2604(b)(3) and 2604(b)(5) and COIB Rules §§ 1-01(a) and 1-01(h)(l).

The Board made this determination pursuant to Board Rules 3-01(d)(i)(A)(2) and 3-01(d)(ii)(B) as well as New York City Administrative Code § 3-703(1)(d). As mentioned *supra* ¶¶ 11, 13(a), 13(d), these regulations provide for matching funds ineligibility when campaigns fail to provide the Board with requested documents/information, as well as when the Board has reason to believe that, in the course of Program participation, the candidate has engaged in conduct detrimental to the Program in violation of any other applicable law. The Board provided the Adams Campaign with a Nonpayment Determination and a Supplemental Determination Notice on August 28, 2025.

114.    The next opportunity for the Adams Campaign to demonstrate its eligibility for public matching funds is the October 9, 2025 payment date.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  August 28, 2025
        New York, NY

By:    _____

       Paul S. Ryan